[Civ. No. 9378.   Third Dist.   Jan. 8, 1959.]

RALPH HUTTON, Plaintiff and Appellant, v. ALBERT PAGNI et al., Defendants and Appellants.

Perkins & Carr and Desmond, Miller & Artz for Plaintiff and Appellant.

Desmond, McLaughlin & Russell and McLaughlin & Russell for Defendants and Appellants.

VAN DYKE, P. J.—This is an appeal from an order of the trial court granting plaintiff's motion for a new trial after a defense verdict. There is also presented a cross-appeal taken by plaintiff from the judgment entered upon the defense verdict.

The stated ground upon which the new trial was granted was insufficiency of the evidence to support the verdict of the jury. ▮ As stated in *Estate of Green,* 25 Cal.2d 535, 542 [154 P.2d 692] :

16

" ' . . . The rules of law applicable to an appeal from such an order are well settled. A trial court in considering a motion for new trial is not bound by the rule of conflicting evidence. [Citing cases.] ■ When the motion is granted, as here, for insufficiency of the evidence, it is only in rare cases showing abuse of discretion that an appellate court will interfere because the trial judge must weigh all the evidence and determine the just conclusion to be drawn therefrom. [Citing cases.] ■ It cannot be held that a trial court has abused its discretion where there is a conflict in the evidence or where there is any evidence which would support a judgment in favor of the moving party.' (*Hames* v. *Rust*, 14 Cal.2d 119, 123-124 [92 P.2d 1010].) "

■ Respondent, Ralph Hutton, suffered a loss of vision in his left eye as the result of an accident when a fragment of metal penetrated his eye while he was assisting appellant Borland in aligning punching dies on a 100-ton hydraulic press owned by Borland's employer, Pagni. Borland, at the time, was in charge of the punching operations and of the press and was acting in the scope of his employment by Pagni. Hutton was a welder employed by Fontaine and Bean, a sheet metal firm in Sacramento. Although an experienced welder, he had never operated a hydraulic punch or brake press and had had no experience in setting or aligning punching dies in such presses. Hutton's employers fabricated and supplied sinks made of 14-gauge stainless steel. To shear, to brake and to punch the holes in the steel sheets they sent the sheets to Pagni who had a press that would do that work. Hutton was sent to Pagni to transport 12 or 14 sheets of steel to Pagni's works, there to be sheared, braked and punched. Although he had no specific instructions to assist in the work, he also had no orders not to do so. When he arrived at the Pagni plant with the sheets he found that by assisting in the work to be done he would be able to return to his employers with sufficient sheets that had been sheared, braked and punched to enable him to continue his work of completing sinks which were needed by his employer. Borland was assigned by his foreman to do the press work. He and Hutton marked the sheets for shearing and punching, using a pattern supplied for that purpose. They then sheared them, which readied them for punching. Hutton and Borland then went over to the press to set it up for punching. Borland selected the punching dies to be used. The dies consisted of two parts, the punch, commonly referred to as the male die which is set

in the head or ram of the press, and the bottom or female die or matrix, which is fastened in place on the bed of the press. When the dies are set the sheet to be punched is inserted between and the punch is then pressed through the metal into a hole in the matrix. The punch fits very closely into the hole in the matrix, the tolerance being about one to two thousandths of an inch. There was expert testimony that there are two customary and approved methods of setting the dies and so adjusting them that the punch will descend smoothly into the matrix without its edge striking the matrix. By one method both dies are in an engaged position on the bed of the press when the press head is lowered to the punch, which is then secured by set screws to the press head. The head is then raised without disengaging the dies and after properly aligning the female die on the press bed it is secured in that position, thus assuring that when the press is operated the punch will descend smoothly into the matrix. Another customary and approved method is to secure the punch to the press head, then hold the female die up to the punch, engage the two and then lower the entire assembly to the press bed when the female die can be secured to the bed. Borland did not employ either method. With Hutton assisting him they first secured the punch in position against the press head by lifting it into place and attaching it by the set screws. The punch assembly weighed about 25 pounds. They then placed the female die, which weighed about 40 pounds, on the bed of the press and moved it into approximately correct position to receive the punch. They then lowered the press head, with the punch in position, to within about an inch of the top of the matrix and approximately over the hole into which it was to go in operation. Hutton observed that the female die was not lined up laterally so as to admit the punch and he reached over and made a manual adjustment, moving it about an eighth or a quarter of an inch to the right. He then stepped back to get a better look, at which time Borland released the punch which came down and, being improperly adjusted, struck the female die instead of entering into the hole. There was a crunching sound as the punch struck the female die and a chip of metal flew off, piercing Hutton's eye. The method used by Borland was one which, according to the testimony, could be followed, but the testimony also showed that if that method was being followed then when the punch closely approximated the matrix the further lowering ought to be completed by the use of an inching device which would

permit lowering the punch as little as one thousandth of an inch at a time, thus affording ample opportunity to accurately adjust the female die to the descending punch so as to properly accommodate it. This device was on the press but Borland did not use it.

It seems obvious to us that the foregoing evidence would support a jury verdict that Borland had been guilty of negligence in adjusting the dies and that that negligence proximately caused Hutton's injury. The jury could infer that of three safe methods Borland ignored all and depended on visual measurement for adjusting the dies; that in view of the great power of the press a failure to so adjust the dies that the punch would descend smoothly into the matrix would probably cause compression fracturing of the metal of the die and the matrix; and that this was just what happened. Several persons at varying distances from the press heard the crunch of metal against metal. We think it unnecessary to elaborate further. We hold that the evidence was sufficient to support a verdict for Hutton had the jury rendered one and that therefore the trial court's order granting a new trial cannot be disturbed on appeal.

■ There is another reason why in this case and on this record the sufficiency of the evidence to support a verdict for Hutton cannot be challenged. From the evidence the jury could find that the accident resulting in injury to Hutton was of a kind which ordinarily does not occur in the absence of someone's negligence; that it was caused by an instrumentality in the control of Borland; and that it was not due to any voluntary action or contribution on the part of Hutton. The doctrine of res ipsa loquitur could be applied by the jury. (*Seneris* v. *Haas*, 45 Cal.2d 811, 823 [291 P.2d 915].) Surely, one engaged in setting dies for punching holes in sheet metal by use of a 100-ton press would be careful not to permit the punch to descend against the matrix to the damage of the metal composing both. There were customarily-used methods by which this could be easily avoided and the particular press here involved was equipped with an inching device to avoid that result if the method actually used by Borland was being followed. The impact of the punch upon the matrix, resulting in the discharge of the steel particle that injured Hutton, could have been found by the jury to have been something that does not ordinarily occur in the absence of negligence in setting the dies.

The jury could likewise have found that the instrumentality

causing the injury was under the control of Borland acting in the scope of his employment by Pagni. And, finally, the jury could have found that the accident was not due to any voluntary action or contribution on the part of Hutton.

██ The fact that no instruction on res ipsa was requested by Hutton or given by the trial court is not material. The doctrine concerns a type of circumstantial evidence upon which a plaintiff may rely to discharge his burden of proving a defendant's negligence. Such evidence was given to the jury in this case. There appears to have been no reason why the jury might not have drawn the inference of negligence without a specific instruction authorizing them to do so. (*Fedler* v. *Hygelund,* 106 Cal.App.2d 480, 487 [235 P.2d 247]; *Rose* v. *Melody Lane,* 39 Cal.2d 481, 488 [247 P.2d 335].)

For the reasons given, the order granting a new trial is affirmed. ██ Since the affirmance of the order granting a new trial will automatically vacate the judgment from which respondent has appealed, that appeal is dismissed. (See *Lee* v. *Cranford,* 107 Cal.App.2d 677, 681-682 [237 P.2d 986].)

Peek, J., and Schottky, J., concurred.

The petition of defendants and appellants for a hearing by the Supreme Court was denied March 4, 1959.