[Civ. No. 24119. First Dist., Div. One. Apr. 8, 1968.]

RENATO J. CASETTA, Plaintiff and Appellant, v. UNITED STATES RUBBER CO. et al., Defendants and Respondents.

Tormey & Cotchett and Joseph W. Cotchett for Plaintiff and Appellant.

F. Whitney Tenney, M. Laurence Popofsky and Heller, Ehrman, White & McAuliffe for Defendants and Respondents.

SIMS, J.—Plaintiff, a tire repairman, who was injured as a result of an explosion which occurred while he was mounting a new automobile tire on a rim, has appealed from a judgment

in favor of the manufacturer and the distributor of the tire, entered following the granting of their motion for judgment notwithstanding a verdict which had awarded plaintiff $58,500.[1]

The issues as framed by the pretrial order[2] were negligence of the defendants or either of them, contributory negligence of the plaintiff, breach of warranty by either defendant, proximate cause, and the injury and damages to the plaintiff. At the conclusion of the plaintiff's case, in connection with argument on a motion for nonsuit, it was recognized that the plaintiff had three theories: "one is the negligence of the manufacturer in the sale and distribution of the tire proximately resulting in injury and damage to this plaintiff . . . and the second, the breach of implied warranty of the tire and fitness . . . and the third one is strict liability in tort." When the defendants moved for a directed verdict after all the evidence was in, the plaintiff advanced the additional theory that the defendants were negligent in not warning the plaintiff of a particular hazard in mounting a tire of the type in question upon the particular type of hump-type safety rim which was involved.

The trial court in effect granted the defendants a directed verdict on plaintiff's "theory of breach of implied warranty of fitness of the tire" "for the use to which it was put" and "on the theory of negligence in the manufacture, sale or distribution of the tire"; and left for the jury the question of whether there was a defect in the tire which would support the theory of strict liability in tort. The court rejected pro-

---

[1]The judgment on the verdict was reduced, by the admitted amount of workmen's compensation benefits paid to plaintiff, to the sum of $51,929.10, because the jury found in response to special interrogatories that the plaintiff's employer, the retailer, was negligent and that his negligence was a proximate cause of the injury and damage suffered by plaintiff. (See *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 69-73 [17 Cal.Rptr. 369, 366 P.2d 641].)

[2]The complaint contained causes of action against the automobile manufacturer which supplied the rim on which defendant was attempting to mount the tire, and against the manufacturer of the tire-changing equipment. Judgment was entered in favor of the automobile manufacturer following granting of its motion for summary judgment. On the third day of the trial the action was dismissed with prejudice as to the equipment manufacturer. The pretrial order also referred to the issues raised by the latter defendant, and to the issues raised by the claim of the plaintiff's employer's compensation carrier, which sought indemnity (*cf.* fn. 1, *supra*), but subsequently, before trial, dismissed its complaint in intervention without prejudice.

posed instructions which embodied plaintiff's other theories. It also refused to give instructions which proposed the conditional application of the res ipsa loquitur doctrine to the theory of strict liability in order to supply proof that the product was defective, and similar instructions, both conditional and unconditional, in support of plaintiff's theory of negligence.

The court instructed the jury, "In this action plaintiff has the burden of proving that the tire involved in the accident contained a defect which existed with or without the negligence of the defendant United States Rubber Company, and further, that the defect thus identified was the proximate cause of injury and damage to plaintiff"; and gave further instructions as offered by the parties on the theory of the strict liability of a manufacturer and distributor of a defective product. No instructions were given with respect to defendants' negligence or breach of warranty. Negligence was alluded to in connection with the claim that plaintiff's employer was negligent as submitted in special interrogatories (see fn. 1, *supra*). Despite the fact that defendants' negligence and plaintiff's contributory negligence were not in issue, the court did give an instruction on the two elements of contributory negligence patterned after the first paragraph of BAJI Instruction No. 103-C, and an instruction on the varying amount of caution required in the words of BAJI Instruction No. 102-A prior to its revision. No other instructions defining negligence or otherwise prescribing the application of principles of negligence were given.

On this appeal plaintiff contends that the court erred in granting the defendants' motion for judgment notwithstanding the verdict because there is evidence of sufficient substantiality to support the verdict that there was a physical defect in the product which proximately caused injuries for which the defendants, as manufacturer and distributor, respectively, are strictly liable. If plaintiff establishes this contention the reversal of the judgment entered upon the granting of defendants' motion would reinstate the judgment on the verdict. (*Ferran* v. *Mulcrevy* (1935) 9 Cal.App.2d 129, 131-132 [48 P.2d 948]; and see *Devens* v. *Goldberg* (1948) 33 Cal.2d 173, 181 [199 P.2d 943]; *Tomlinson* v. *Kiramidjian* (1933) 133 Cal.App. 418, 422-423 [24 P.2d 559]; *Lauritsen* v. *Goldsmith* (1929) 99 Cal.App. 671, 676 [279 P. 168]; and discussion *Espinoza* v. *Rossini* (1966) 247 Cal.App.2d 40, 55-

56 [55 Cal.Rptr. 205]; and *Gibson* v. *Southern Pac. Co.* (1955) 137 Cal.App.2d 337, 355 [290 P.2d 347].)[3]

He further asserts: ''The theory of negligence is supported by evidence of sufficient substantiality to support the verdict that there was a failure to warn which deemed the product defective.''[4] The question of plaintiff's right to recover, because of defendants' failure to warn of possible dangerous conditions arising from the use of the tire, either on the theory of strict liability, or on the theory of negligence was withdrawn from the consideration of the jury. Unless the evidence compels a finding in his favor, he cannot rely upon either theory in support of his judgment. (*Healy* v. *Brewster* (1963) 59 Cal.2d 455, 464-465 [30 Cal.Rptr. 129, 380 P.2d 817]; *Zak* v. *State Farm etc. Ins. Co.* (1965) 232 Cal.App.2d 500, 506-507 [42 Cal.Rptr. 908]; *People* v. *Frank* (1964) 225 Cal.App.2d 339, 342 [37 Cal.Rptr. 202].) This is not to say that he cannot show that there was substantial evidence to support either theory, and, upon that basis contend that the court erred in failing to submit the matter to the jury on conflicting evidence. If there is such error the judgment notwithstanding the verdict cannot be sustained. But the judgment on the verdict could not be reinstated. It would be necessary to have a new trial to resolve the conflicting evidence on the theories improperly withheld from the jury.

Finally plaintiff contends: ''The theory of res ipsa loquitur is supported by evidence of sufficient substantiality to support

[3]Defendants seek review of the propriety of the trial court's refusal to grant their alternative motion for a new trial. (See Code Civ. Proc., § 629, 4th par.) They contend that if the judge was convinced, as he had indicated, that the verdict of the jury was against the weight of the evidence he had a duty to grant the motion. (See *Figone* v. *Statter* (1967) 248 Cal.App.2d 699, 703-705 [56 Cal.Rptr. 762]; and *Tice* v. *Kaiser Co.* (1951) 102 Cal.App.2d 44, 45-46 [226 P.2d 624].) The record reveals, however, that the court intended to have matters resolved so that if it was wrong in finding that there was no evidence to show strict liability as a matter of law, the verdict should stand. (See *Gibson* v. *Southern Pac. Co.* (1955) 137 Cal.App.2d 337, 355 [290 P.2d 347].) In any event it is questionable whether defendants can assert error in the denial of a motion for a new trial in the absence of a cross-appeal from the original judgment. (*Cf.* Cal. Rules of Court, rules 3(a)(2) and 3(b)(2); and see *Rodriquez* v. *Barnett* (1959) 52 Cal.2d 154, 156 [338 P.2d 907].)

[4]The phraseology of this statement reveals some confusion as to whether the plaintiff is relying upon negligence, or upon a theory of strict liability arising because it was unreasonably dangerous to place the tire in the hands of the user without warning of possible, but uncontemplated, untoward results from its use under certain circumstances. (See *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 50-53 and 55-56 [46 Cal.Rptr. 552].) Reference to the rejected instructions discloses that plaintiff advanced both theories.

the verdict that the tire was defective." Defendants correctly analyze this contention as a factor to be considered in the determination of the sufficiency of the verdict of the jury. If the application of the doctrine serves to establish substantial evidence in support of the verdict, defendants cannot complain because the jury drew the permissible inference without the assistance of the instructions which were withheld. (*Seeley* v. *Combs* (1966) 65 Cal.2d 127, 132 [52 Cal.Rptr. 578, 416 P.2d 810] ; *Hutton* v. *Pagni* (1959) 167 Cal.App.2d 14, 19 [333 P.2d 826].)

An examination of the record in the light of the applicable principles of procedural and substantive law indicates that the court properly concluded that the evidence produced was insufficient to support a finding of a defect in the tire which would support a judgment predicated upon the strict liability of the distributor or the manufacturer. ▆▆ However, since there was substantial evidence to show that the manufacturer and the distributor failed to give prospective users warning with respect to the special hazards arising out of the mounting of the tire on "safety" rims, the trial court erred in withholding this issue from the jury and the case must be reversed and remanded for a new trial.

I. *Preliminary Considerations*

▆▆ "The judgment can be supported only if, giving plaintiff's evidence full prima facie value and indulging in every reasonable inference that can be drawn therefrom and with all conflicts resolved in plaintiff's favor, the result is a determination that there is no substantial evidence to support a judgment for the plaintiff. ▆▆ Neither the appellate court nor the lower court may weigh the evidence or consider the credibility of the witnesses. [Citation.] ▆▆ The plaintiff here may rely on that portion of testimony given under Code of Civil Procedure, section 2055, which is favorable to him and disregard the unfavorable portions. [Citation.] However, the evidence produced by plaintiff must support a logical inference in his favor, sufficient to raise more than a mere conjecture or surmise that a fact is as alleged in order to warrant submission of the question to a jury [citation], and a court should not put itself in the incongruous position of destroying logic to hold a case in court. [Citation.] It is in the light of these principles that the evidence must be reviewed." (*Reynolds* v. *Natural Gas Equipment, Inc.* (1960) 184 Cal.App.2d 724, 731 [7 Cal.Rptr. 879]. See also [where issue of fact found] *Reuther* v. *Viall* (1965) 62 Cal.2d 470, 474-475 [42

Cal.Rptr. 456, 398 P.2d 792] ; *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 261-263 [37 Cal.Rptr. 896, 391 P.2d 168] ; *Gherna* v. *Ford Motor Co.* (1966) 246 Cal.App.2d 639, 646-647 [55 Cal.Rptr. 94] ; *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 55-56 [46 Cal.Rptr. 552] ; *Crane* v. *Sears Roebuck & Co.* (1963) 218 Cal.App.2d 855, 859 [32 Cal.Rptr. 754] ; *Bulow* v. *Dawn Patrol* (1963) 216 Cal.App.2d 721, 730-731 [31 Cal.Rptr. 132] ; *Truck Ins. Exchange* v. *Stilley* (1963) 213 Cal.App.2d 311, 321 [28 Cal.Rptr. 588] ; and *Lasry* v. *Lederman* (1957) 147 Cal.App.2d 480, 486, 488 [305 P.2d 663]. *Cf.* [where no issue of fact raised or rebutted as a matter of law] *Leonard* v. *Watsonville Community Hospital* (1956) 47 Cal.2d 509, 514-515 [305 P.2d 36] ; *Simmons* v. *Rhodes & Jamieson, Ltd.* (1956) 46 Cal.2d 190, 196 [293 P.2d 26] ; *Engstrom* v. *Auburn Auto. Sales Corp.* (1938) 11 Cal.2d 64, 66 [77 P.2d 1059] ; *Erickson* v. *Sears, Roebuck & Co.* (1966) 240 Cal.App.2d 793, 800 [50 Cal.Rptr. 143] ; *Teich* v. *General Mills, Inc.* (1959) 170 Cal.App.2d 791, 794-795 [339 P.2d 627] ; *Lockhart* v. *Martin* (1958) 159 Cal.App.2d 760, 762 [324 P.2d 340] ; *Eramdjian* v. *Interstate Bakery Corp.* (1957) 153 Cal.App.2d 590, 602 [315 P.2d 19] ; *Ceranski* v. *Muensch* (1943) 60 Cal.App.2d 751, 753 [141 P.2d 750] ; and *Boomer* v. *Southern Cal. Edison Co.* (1928) 91 Cal.App. 375, 380-381 [267 P. 178].)

II. *Sufficiency of the Evidence to Show that the Tire Itself Was Defective*

■ "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]. See also *Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 260-261; *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 649-650; *Preston* v. *Up-Right, Inc.* (1966) 243 Cal.App.2d 636, 638 [52 Cal.Rptr. 679] ; *Erickson* v. *Sears, Roebuck & Co., supra,* 240 Cal.App. 2d 793, 798; *Canifax* v. *Hercules Powder Co., supra,* 237 Cal. App.2d 44, 51; *Crane* v. *Sears Roebuck & Co., supra,* 218 Cal.App.2d 855, 859-860; and *Reynolds* v. *Natural Gas Equipment, Inc., supra,* 184 Cal.App.2d 724, 736.) Also "a retailer engaged in the business of distributing goods to the public . . . is strictly liable in tort for personal injuries caused by defects in [articles] sold by it. [Citations.]" (*Vandermark* v.

*Ford Motor Co., supra,* at p. 263. See also *Gherna* v. *Ford Motor Co., supra,* at pp. 649-650; *Erickson* v. *Sears, Roebuck & Co., supra,* at p. 798; *Canifax* v. *Hercules Powder Co., supra,* at p. 51; and *Reynolds* v. *Natural Gas Equipment, Inc., supra,* at p. 736.) "In 'Comment f' [2 Rest., 2d Torts § 402A, p. 350] the rule stated is said to apply to 'any person engaged in the business of selling,' and therefore applies not only to manufacturers but 'to any wholesale or retail dealer or distributor.' . . . The fact that [the distributor] chooses to delegate the manufacture of [product] to another and that it causes the manufacturer to ship the product directly to the consumer cannot be an escape hatch to avoid liability." (*Canifax* v. *Hercules Powder Co., supra,* at p. 52.)

▇▇▇ The burden is upon the plaintiff to show that the tire was defective and that the defect caused the explosion. (*Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 650; *Preston* v. *Up-Right, Inc., supra,* 243 Cal.App.2d 636, 639; *Erickson* v. *Sears, Roebuck & Co., supra,* 240 Cal.App.2d 793, 798.) In *Greenman, supra,* the court stated, "To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the Shopsmith in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use." (59 Cal.2d at p. 64.) In *Vandermark, supra,* it ruled, "The trial court struck the testimony of the possible causes of the failure of the piston to retract, on the ground that there was no direct evidence that any one or more of the causes existed, and it rejected plaintiffs' offer to prove that all of the possible causes were attributable to defendants. These rulings were erroneous, for plaintiffs were entitled to establish the existence of a defect and defendants' responsibility therefor by circumstantial evidence, particularly when, as in this case, the damage to the car in the collision precluded determining whether or not the master cylinder assembly had been properly installed and adjusted before the accident." (61 Cal.2d at p. 260. See also *Gherna* v. *Ford Motor Co., supra,* at p. 650; and *Erickson* v. *Sears, Roebuck & Co., supra,* at pp. 798-799.)

Plaintiff was hired by the U-Save discount gasoline house in San Mateo in 1962. Previously he had served three years in the Army where he had worked as a tow truck mechanic in a motor pool and had changed "quite a few" tires. He was assigned to the service room at U-Save where his duties con-

sisted of mounting and changing tires and lubricating cars. Prior to the accident he had mounted over 3,000 tires.

The procedure for the sale of a tire was that a customer would pick out a tire at the U-Save store, and then bring the order form out to the service room for the tire change. Plaintiff testified that he would then remove the old tire from the car and place the new tire on the rim. This was done by putting the old tire on a machine called the "Iron Man" and putting a locking nut on to hold the rim in place while the old tire was removed. The tire was removed by removing the valve stem from the tube and allowing the pressure to escape. The old tire could then be removed from the rim with tools which were used to break the joints between the beads of the tire and the wheel rim.

The new tire was then placed on the rim, pressing it down to seal the bottom bead, feeling the beads and then filling it with air to seal the top bead. The tube tire required the placing of the tube in the tire and pulling the valve stem up through the rim for inflation. After inflating the tire the top bead would seat. Plaintiff testified in some cases it was necessary to wrestle or center the tire to make it seat. He indicated the air hose could be clamped on to the valve stem to give him free hands to center the tire while it was being inflated. Once the tire was seated, he removed the air hose and clamp. He had been instructed to use a rubber lubricant when he found it difficult to mount a tire, but in his experience lubrication was not necessary on the type of tire involved in the accident because such tires were flimsy and would easily seat.

A fellow employee who had trained plaintiff on the job confirmed that it was not normal procedure to use a lubricant while mounting a tire, and that in mounting over 5,000 tires he had only had occasion to use a lubricant once or twice on truck tires and once on a heavy gauge tire for a passenger car. The manager of the service department testified that lubricants were used if the serviceman had the time, or when necessary, because a tire "would not take properly, after a couple of tries"; and that the practice was to dispense with lubrication in the interest of serving the customer quickly.

The tires sold at U-Save were delivered directly from United States Rubber Company by the distributor Gasoline Marketers under the brand name Fisk. The Fisk tires ranged in grade and price from $40 to under $10, for a Fisk Windsor. The Windsor was the most inexpensive tire produced by the manufacturer in the Fisk line. It was used by the retailer

as a "lead item" to get the customer in and then sell him the next grade above. The tires were inflated during the manufacturing process to 50 pounds per square inch at 300 degrees, or the equivalent of 70 pounds per square inch at room temperature, and they were constructed to specifications designed to produce a carcass strength, through materials used in the fabric plies and bead wires, of 150 pounds per square inch, if properly mounted. Some of the tires received by plaintiff's employer were damaged or defective when they arrived. These defects consisted of "a blemish on a whitewall, a small puffiness in the sidewall or something that looked like a line or a fine cut in the sidewall." On a few occasions with the less expensive tires it was found that immediately after mounting and use, tubes had been cut by cords inside the tire. No tires had been found with defective beads.

On February 8, 1963, at about 5 p.m., a customer came in to buy two tires. Plaintiff put the customer's car on the rack and removed the old tires and rims, put them on the machine and took off the old tires. The customer purchased two Fisk Windsor tires and plaintiff began the mounting process. These rims were Chrysler safety or hump-type rims. In the mid-1950's various automobile manufacturers introduced this rim to safeguard motorists by providing that a tire would not fly off the rim during the course of a service failure or blowout. Although thus protecting the motorist, the new style "safety rim" markedly increased the danger of explosion for those engaged in mounting tires. This danger arose from the fact that air pressure was utilized to "seat" the tire on all tire rims. To "seat" a tire on a hump-type rim the beads of the tire had to be forced over the slightly larger diametered hump of the rim by inflating the tire. In essence, the process required a tire with a bead diameter of 14.890 inches to pass over a hump with a 14.968 inch diameter in order to reach the seating position. The process involved the compression of the bead material and not the "stretching" of the bead wire.

Plaintiff testified he was not instructed and had no idea that certain rims caused problems and that he never noticed any difference between rims except for the difference, not material in this case, between a 14-inch rim and a 15-inch rim. The fact that the rim involved in the accident was from a Plymouth made no difference to him. He also testified that he had not noticed that Chrysler safety rims were more difficult to work with than other rims, or that you had to lubricate tires mounted on Chrysler products.

The first tire was mounted without incident. On the mounting of the second tire he placed the new tire over the rim so that the bottom bead was in place. He spread the tire, put the tube in it and placed the valve stem through the rim. He removed the valve core from the stem prior to putting the tube in the tire, put the top bead of the tire on the rim, and inspected the old tube before it was put in the tire. The clamping cone was removed from the machine prior to inflating, pursuant to instructions. Plaintiff inflated the tire, heard it seat (pop) and reached over to remove the air clamp and hose. When plaintiff heard the pop, he assumed the beads of the tire were against the edge of the rim, and the tire was fully mounted. Immediately after he had reached over to remove the air hose, the tire exploded. Plaintiff testified that he had put air into the tire for approximately 10 or 15 seconds prior to the seating of the tire, and the explosion occurred immediately after the tire seated. He estimated he had around 35-50 pounds of air in the tire at the time.

The plaintiff, who was knocked 5 or 6 feet away from the machine, remembered nothing following the explosion until he woke up in the hospital with the injuries for which he seeks damages. The customer, who was standing 10 to 15 feet away, testified that the explosion felt like a sonic boom; that there was a pop and then tremendous pressure. The force of the explosion propelled the wheel and tire against the 12-foot high ceiling where they knocked down some flourescent light fixtures and left an indentation in the roof.

The customer testified that he did not notice anything unusual, or that any additional time was taken in mounting the second tire. An expert witness for the manufacturer revealed that as the result of experiments he conducted with a tire, an air hose and a compressor, all with capacities similar to that involved, a pressure of 49 pounds per square inch would build up in the tire in 16 seconds.[5]

The wheel was identified by the customer. An expert witness who examined it for the automobile manufacturer testified that it was a perfect safety rim wheel with no defects.

Four witnesses testified to examining the tire after the acci-

---

[5] A graph introduced in evidence contains the following figures:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10 seconds—30 pounds p.s.i. | | | | 22 seconds—65 pounds p.s.i. | | | |
| 12 | ,, | 34 | ,, | ,, | 24 | ,, | 71 | ,, | ,, |
| 14 | ,, | 41 | ,, | ,, | 26 | ,, | 77 | ,, | ,, |
| 16 | ,, | 49 | ,, | ,, | 28 | ,, | 83 | ,, | ,, |
| 18 | ,, | 54 | ,, | ,, | 30 | ,, | 88 | ,, | ,, |
| 20 | ,, | 59 | ,, | ,, | | | | |

dent. The manager of the service station saw the tire and wheel on the floor. He inspected the tire after the ambulance took the plaintiff away. According to him the tire was face up and looked quite normal, but when he picked it up he observed that the bead of the tire was over the backside or inside of the rim; that the bead was misshapen and appeared to be broken in one place; that although he could not see the steel strands which were embedded in the bead, the area showed a definite break or protrusion sticking out at a sharp angle; and that he could feel that it was loose or broken. He did not observe any other break in the bead, or any cut or slice in the sidewall, but he did note a 12-inch slash in the inner tube which ran in line with the circumference of the tire.

The assistant manager of the service station testified that he examined the tire shortly after the ambulance took plaintiff; that it was part on and part off the rim; that he found two breaks in the tire on the bead, which he considered "a piece of wire that runs around in" the tire; that the bead was all "curlycue" in two places; that there were one or two, 2-inch rips in the bead; and that the wire was up over the rubber and one could put a finger between where the wire had popped out and where the wire was bent. He also observed a 5- or 6-inch rip or slash in the outer rubber of the wall of the tire just above the bead. According to him this slit or cut ran into the bead break. It was simply in the outer rubber and did not go into the cord or casing.

A police officer who was investigating the accident first observed the tire after it had been placed up edgeways against the leg of a workbench. He testified that he observed that one bead of the tire was outside the rim; that there was a large sized rip in the tire of from 10 to 12 inches in length which went right through the tire to a corresponding tear in the tube; and that a section of the air hose, containing the nozzle, was still attached to the valve stem of the tube. He looked at the bead, but did not notice anything in particular about it, and as far as he could recall it was not broken or bent. He could not say where the tear in the tire was located in relation to the bead. He acknowledged that he had erroneously omitted to mention the rip in the tire itself in his report.

The tire was removed from the wheel and rim so that a new tire could be mounted for the customer. The tire and tube were taken to the manager's office. On the following day a co-worker examined the tire. He noticed a gash in the side of the

tire and on the tube, which ran about 8 to 10 inches in an arc along the sidewall from about one-half or three-quarters of an inch away from the bead toward the tread of the tire. At the time of trial he had no recollection of any damage to the bead itself.

The ultimate disposition of the tire is not clear. According to the manager he put plaintiff's name on the tire in yellow chalk and it remained in his office for two months or so, because he was asked to retain it by the president of the distributing firm. Then in order to get it out of the way he tagged it with masking tape and a note indicating that it was the accident tire and should be held for the distributor, and gave it to the driver of a truck who had come to return the normal adjustment tires to the distributor. Although he was not sure of the identity of the truck driver, he recalled telling him it was the accident tire, that it should be put away by itself, and that an official of the distributor should be notified.

The assistant manager testified that the tire remained in the office three weeks or a little longer; that a driver for the distributor came down specially to pick up that particular tire; that pursuant to instructions from the manager he removed the tire from the office and delivered it to the driver; and that no one pasted a piece of paper on it to identify it.

The driver, to whom the assistant manager allegedly delivered the tire, testified that he did not ask for the particular tire; that in July of 1963 he received a tire from the manager which the manager identified as the tire which was involved in plaintiff's accident; that he took this tire to the distributor's warehouse, and, within 30 days after he picked it up, he left it at the manufacturer's warehouse with an adjustment slip, which he prepared and which indicated that this was a manufacturer's defect consisting of a bent bead. According to this witness the tire which he received and turned in for adjustment did not have a slash or tear, the bead was not broken, nor was any wire showing, but it was bent in two places approximately 60 degrees apart on the inner surface of the circle of the bead. The driver doubted that there was any reference on the tire to plaintiff at the time it was delivered to the manufacturer's warehouse.

There is no direct evidence of the cause of the explosion. No expert was able to inspect the tire to determine whether or not it had a defect. Plaintiff relies upon the following circumstantial evidence: the plaintiff's testimony that he put air in the tire for only 10 to 15 seconds; the tests which showed that

only 49 pounds per square inch would result in 16 seconds; the customer's testimony that there was apparently nothing different in the second disastrous mounting procedure from the first successful one; the expert's testimony that the type of tire involved was manufactured to withstand 150 pounds per square inch when properly and fully mounted; the plaintiff's testimony that he heard the bead seat, indicating the tire was mounted; the condition of the tire after the accident; the plaintiff's testimony regarding his training and experience, and the procedure followed on the occasion of the accident; the fact that defective tires had been received by the retailer in the past; and the fact that the distributor's agent received the tire as a defective tire and made claim to the manufacturer for an adjustment on that basis.

The plaintiff is entitled to rely on circumstantial evidence to establish the existence of a defect. (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 260; *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 650; *Erickson* v. *Sears, Roebuck & Co., supra,* 240 Cal.App.2d 793, 799.) ▮ The trier of fact may accept circumstantial evidence, consisting of the physical facts, as proof of an ultimate fact, and reject direct evidence to the contrary. (*Seeley* v. *Combs, supra,* 65 Cal.2d 127, 132-133; *Gray* v. *Southern Pac. Co.* (1944) 23 Cal.2d 632, 641 [145 P.2d 561] ; *Truck Ins. Exchange* v. *Stilley, supra,* 213 Cal.App.2d 311, 323-324; *Kerner* v. *Peacock Dairies, Inc.* (1933) 129 Cal.App. 686, 689 [19 P.2d 283].) He is also entitled to the full weight of the admission of the distributor's agent. (*Bonebrake* v. *McCormick* (1950) 35 Cal.2d 16, 18-19 [215 P.2d 728] ; *Langensand* v. *Obert* (1933) 129 Cal. App. 214, 218 [18 P.2d 725] ; *Gates* v. *Pendleton* (1925) 71 Cal.App. 752, 759 [236 P. 365].)

▮ The lacuna in plaintiff's proof is the absence of testimony to show that any of the defects, the existence of which is suggested by the testimony, was of a type which could have contributed to the explosion. The retailer's manager referred to blemishes on the whitewalls, small puffiness in the sidewall, and something that looked like a fine line or cut in the sidewall. He also testified that tires were returned after road use because the inner cords had damaged the tube. There was no evidence to show that this trouble ever manifested itself in the mounting process. Such manifestation, of course, would have precluded later complaint. There is nothing to suggest that any of the other alleged defects had any effect on the capacity of the tire to hold normal air pressures. Plaintiff does not

mention the blemish. No testimony, lay or expert, was offered to show that the puffiness or lines or cuts had ever, or would ever result in a failure from mere inflation with a normal amount of air pressure. The only evidence on the subject is to the contrary. The puffiness represents a problem of adhesion between tread and outer rubber and the cord, which itself furnishes the strength to hold in the air. The same is true of lines or cuts in the outer surface. This evidence was produced by defendants, but even if it were disbelieved by the jury, such disbelief cannot supply the lack of affirmative proof. (*Eramdjian* v. *Interstate Bakery Corp., supra*, 153 Cal.App. 2d 590, 602.)

The distributor's agent testified that he returned the tire which he received from the retailer for adjustment because of a defect which he denominated "bent bead." In considering the effect of this evidence on plaintiff's case, the adverse witness' further testimony, that his job was to present any tire which looked like it had something wrong with it and which he thought he could get credit for, must be disregarded. So must the obvious discrepancies between his testimony and that of the manager and assistant manager concerning the time and general circumstances under which he picked up the tire. Nevertheless, if it was in fact the tire involved, it was the tire which the manager testified had a defect on the bead, which if it were present before the explosion, would have been noticed by anyone handling the tire. Proof that the tire was the subject of a claim for a "defective" tire after the explosion does not answer the question of whether such a defect existed before. Furthermore, in the absence of evidence as to whether the manufacturer allowed an adjustment, the alleged admission of the distributor cannot bind it.

In *Vandermark* the court expressly pointed out that it was error to exclude proffered expert testimony that the accident could have been caused by an inherent defect in the brake system, and the substance of this offer of proof was relied on by the court in upholding plaintiff's theory of strict liability. (61 Cal.2d 256 at pp. 260-261.) Similar evidentiary references are found in other cases applying the theory of strict liability. (*Greenman* v. *Yuba Power Products Inc., supra*, 59 Cal.2d 57, 60 [expert testimony on defective design and construction]; *Gherna* v. *Ford Motor Co., supra*, 246 Cal.App.2d 639, 650 [expert testimony of a short in the wiring system and of a potential fire hazard created by the design]; *Reynolds* v. *Natural Gas Equipment, Inc., supra*, 184 Cal.App.2d 724, 737

[testimony that design and installation of air cap permitted gas to back up] ; and see *Trust* v. *Arden Farms Co.* (1958) 50 Cal.2d 217, 226 [324 P.2d 583, 81 A.L.R.2d 332], Carter, J. concurring and dissenting [testimony that fragmentation pattern revealed defect].) It has been observed that where an object is inherently dangerous expert testimony may not be indispensable. (*Erickson* v. *Sears, Roebuck & Co., supra,* 240 Cal.App.2d 793, 799.) The tire itself is not inherently dangerous, and there must be some proof which will justify the inference that a defect exists. In the absence of any specific explanation of the cause of the explosion, plaintiff is relegated to the doctrine of res ipsa loquitur, and the necessity of proving the facts which give rise to its operation.

III. *Res Ipsa Loquitur*

The three conditions requisite for the application of the doctrine of res ipsa loquitur are the following: "The doctrine of res ipsa loquitur has three conditions: '(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' (Prosser, Torts, p. 295.)" (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]. See also *Seeley* v. *Combs, supra,* 65 Cal.2d 127, 133; *Leonard* v. *Watsonville Community Hospital, supra,* 47 Cal.2d 509, 514; *Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 442-444 [247 P.2d 344] ; *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 457-458 [150 P.2d 436] ; *Honea* v. *City Dairy, Inc.* (1943) 22 Cal.2d 614, 616-617 [140 P.2d 369] ; *Druzanich* v. *Criley* (1942) 19 Cal.2d 439, 444 [122 P.2d 53] ; *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 647; *Cordova* v. *Ford* (1966) 246 Cal.App.2d 180, 184 [54 Cal.Rptr. 508] ; *Reynolds* v. *Natural Gas Equipment, Inc., supra,* 184 Cal.App.2d 724; *Roddiscraft, Inc.* v. *Skelton Logging Co.* (1963) 212 Cal.App. 2d 784, 793 [28 Cal.Rptr. 277] ; *Baker* v. *B. F. Goodrich Co.* (1953) 115 Cal.App.2d 221, 226 [252 P.2d 24].)

The existence of the first requirement is established for the reasons enunciated in *Baker* v. *B. F. Goodrich Co., supra,* 115 Cal.App.2d 221, as follows: "As to the first requirement, no extended discussion is necessary for we hardly believe that it can be doubted that the accident here is of a kind which ordinarily does not occur in the absence of someone's negligence. Automobile tires properly constructed

do not explode when inflated in the process of being mounted in the usual and customary manner upon a wheel designed to receive them.'' (115 Cal.App.2d at p. 226.)

The existence of the second condition is governed by the following considerations: ''Many authorities state that the happening of the accident does not speak for itself where it took place some time after defendant had relinquished control of the instrumentality causing the injury. Under the more logical view, however, the doctrine may be applied upon the theory that defendant had control at the time of the alleged negligent act, although not at the time of the accident, *provided* plaintiff first proves that the condition of the instrumentality had not been changed after it left the defendant's possession.'' (*Escola* v. *Coca Cola Bottling Co., supra,* 24 Cal.2d 453, 458.) Defendants do not contend that the tire was improperly stored or handled by the retailer prior to the mounting operation, and this condition may be deemed to have been satisfied.

Defendants vehemently assert that the plaintiff failed to produce evidence to satisfy the third requirement, and that the evidence compels the conclusion that he contributed to the accident. In *Baker, supra,* the court concluded: ''. . . unless it can be said that the evidence here, as a matter of law, does not exclude 'his (appellant's) conduct as a responsible cause,' the fact that the accident occurred while he was engaged in the act of mounting and inflating the tire would not deprive him of the benefit of res ipsa loquitur. Where the evidence is conflicting or subject to different inferences, it is for the jury, under proper instructions, to determine whether each of the conditions necessary to bring into play the rule of res ipsa loquitur are present. [Citation.]'' (115 Cal.App.2d at p. 229. See also *Simmons* v. *Rhodes & Jamieson, Ltd.* (1956) 46 Cal.2d 190, 195 [293 P.2d 26]; *Zentz* v. *Coca Cola Bottling Co., supra,* 39 Cal.2d 436, 444-445; *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 648-649; *Cordova* v. *Ford, supra,* 246 Cal.App.2d 180, 187-188; *Roddiscraft, Inc.* v. *Skelton Logging Co., supra,* 212 Cal. App.2d 784, 802; and *Reynolds* v. *Natural Gas Equipment, Inc., supra,* 184 Cal.App.2d 724, 734-735.)

In *Baker,* as in this case, there was evidence of damage to the bead of the tire following an explosion which occurred while mounting a tire on a so-called Chrysler safety rim. Unlike this case the tire was available, and was inspected by experts. In the opinion of one ''the bead was 'defective to

start, and in the process of pulling it out of the mold and curing, those wires were not in place where they should be, and that has a lot of tendency to bend a lot easier and break.' '' (115 Cal.App.2d at p. 225, and see generally summary of evidence pp. 224-226.) As noted above, the record in this case is not illuminated by any testimony, expert or otherwise, suggesting the manner in which any alleged defect, or alleged negligence in the manufacture or inspection of the tire caused the explosion.

The only testimony in the case on the cause of the explosion is that of the manufacturer's expert, the manager of its tire reliability department experienced in tire testing and product development. He testified that approximately 25,000,000 tires are manufactured each year by the manufacturer and all are inspected by humans rather than by machines. He admitted that some defects get past the inspection system which could cause failure in service of certain types. One such "defect" was a failure of adhesion between the rubber tread and plies ("blows" or "bubbling"). However, during the period from 1952 through 1962 the manufacturer never experienced any bead failure as a result of or during the course of the manufacturing process.

He maintained that no known "defect" can cause a broken bead explosion on a properly mounted tire inflated to an air pressure below 150 pounds per square inch. He also testified that as hump-type rims came into more general use, the manufacturer received numerous reports from the field of serious broken bead accidents occurring during the mounting process. As a result, it commenced a comprehensive series of tests in order to determine the cause of these accidents and the procedures which might be followed to avoid them. These tests were conducted under his direction between 1958 and 1961.

The field reports, which came from all parts of the United States, revealed certain common characteristics in the accidents: (1) no tire involved in the accidents contained any trace of lubricant being used during the course of the mounting process; (2) every tire showed a crescent-shaped scuff mark or tear mark on the lower sidewall area just above the broken bead area; (3) every bead showed that it had been broken under tension; (4) so far as United States Rubber's experience was concerned, every tire had been mounted on a hump-type or safety rim; (5) every tire was of a tubed variety.

He testified that the 300 tests he conducted showed that a

properly centered and lubricated tire mounted on a hump-type rim always seated upon application of air pressure of 20 pounds per square inch. Even an off-centered tire was seated by 30 or 35 pounds per square inch provided that it was properly lubricated. Absent lubrication, an off-centered tire which had not seated on application of 40 pounds per square inch invariably exploded when it seated—if it ever seated at all. The cause of the explosions was the breaking of the bead during the seating. However, he testified that such an explosion never occurred below 72 pounds per square inch.

A tire exploding under these controlled conditions had a crescent-shaped scuff mark or crescent-shaped tear in the sidewall rubber in the area of the broken bead, the size varying with the amount of air pressure and the degree of off-centering. This scuff mark resulted from the friction involved when the sidewall area of the tire slid upward against the rim flange following the break in the bead.

The tests further disclosed that as air pressure increased the violence of the explosion increased and the damage to the sidewall of the tire was similarly accentuated. When 90 pounds of air pressure was reached, two breaks in the bead wires were sometimes observed. In all cases the inner tube had a circumferential rip or tear.

These tests were conducted with the tire's valve core removed, permitting unimpeded inflation at full line pressure.

The expert further testified that he ran tests on tires taken from the production line, in other words, tires that were not defective except for perhaps minor blemishes. He did test tires that were made defective by breaking their beads, and testified that if such tires were lubricated, they always properly seated, with two pounds of air pressure. He never had an explosion with pre-manipulated beads at less than 30 pounds. Unlubricated tires with broken beads always seated with 3-4 pounds of pressure, and never exploded under 50 pounds of pressure.

The expert concluded that in his opinion the explosion was caused by the physical force developed when plaintiff mounted the tire off center with insufficient lubrication while introducing air pressure in excess of 70 pounds per square inch, or for a period of time approximating 25-30 seconds. Based on a hypothetical question, he was asked: "Q. [D]o you have any opinion as to whether or not the cause of the explosion could have been attributed to [sic] by any defect in the manufacture of the tire? A. I do have an opinion. Q. What is

that opinion, sir? A. That it could not have been caused by or contributed to by any defect in the manufacture of the tire."

He expressed the opinion that the accident could not have physically happened under the circumstances (10-15 seconds) estimated by plaintiff because the inflation pressure would have been insufficient to cause the enormous explosion which occurred. He further testified: "Q. In order for an accident to occur such as I have described in my hypothetical question, how much air pressure do you believe had to be in the tire? A. It is my opinion that it would have been in excess of 80 pounds per square inch. Q. And approximately how long, in your opinion, would the air have had to go into the tire to produce enough physical force for the type of explosion which occurred here? A. Assuming the same rate of inflation as on this (indicating), in the order of 27 seconds."

The defendants' contention in this case is similar to that in *Baker*, where the opinion recites: "Counsel for respondent [manufacturer] also earnestly contend that the doctrine is inapplicable here because 'it cannot be said that this accident was more likely caused by respondent's than by appellant's negligence' and 'the probability that the accident was caused by appellant's negligence is equally as great as that it was caused by any negligence of the respondent.' In commenting upon this the court in *Zentz* v. *Coca Cola Bottling Co., supra* [39 Cal.2d 436], uses the following language (p. 453): 'In determining whether such a probability exists with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of expert witnesses.'

"*Common knowledge does not tell us that it is more probable that a tire will explode while in the process of being mounted and inflated as a result of negligence upon the part of the person engaged in doing so than from an inherent defect in the tire itself.* In the absence of expert testimony we would therefore find ourselves in the same position that the Supreme Court did in *Honea* v. *City Dairy, Inc.*, 22 Cal.2d 614 [140 P.2d 369] where it refused to take judicial notice of the technical practices of the bottling industry and therefore could not determine whether it could reasonably be concluded that a defect in a bottle was more probably than not the result of negligence. In such a situation we would be constrained to agree with counsel for respondent that the doctrine was inapplicable. Here, however, as in the *Escola* case, there is expert testimony as to the cause of the accident in question, but this is in sharp conflict." (Italics added; 115 Cal.App.2d at pp.

231-232. See also, in addition to cases cited, *LaPorte* v. *Houston* (1948) 33 Cal.2d 167, 169 [199 P.2d 665] ; *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 647; *Cordova* v. *Ford, supra,* 246 Cal.App.2d 180, 184; and *Lockhart* v. *Martin, supra,* 159 Cal.App.2d 760, 762.) Here, unlike *Baker,* there is no testimony other than the explosion itself to raise the inference that there was a defect in the tire, or that the explosion was the result of the manufacturer's or distributor's negligence. Plaintiff has failed to establish any theory of causation related to a defect.

*Baker* indicates, as emphasized above, that the question of determining the cause of the explosion of a tire which is being mounted is a matter of expert testimony. In *Leonard* v. *Watsonville Community Hospital, supra,* the court recognized that an inference of negligence which arises from the application of the doctrine of res ipsa loquitur can be rebutted by the explanation of the conduct of the person charged. The opinion states, "Plaintiff contends that the inference of res ipsa loquitur was not dispelled as a matter of law and that therefore the court erred in granting the motion for a nonsuit. The same test is applicable in determining when the res ipsa loquitur inference is dispelled as a matter of law as in deciding when any other inference is conclusively rebutted. [Citations.] It has long been the rule in this state that a nonsuit may be granted only when, disregarding conflicting evidence, giving to the plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference which may be drawn from that evidence, the court properly determines that there is no substantial evidence to support a verdict in favor of the plaintiff. [Citations.] There is, however, a qualification on this broad general rule. It is settled that where the evidence raises an inference that a fact exists, and either party produces evidence of the nonexistence of the fact that is clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved, the nonexistence of the fact is established as a matter of law. [Citation.] In these circumstances the inference is dispelled as a matter of law, and, if the fact inferred is necessary to establish an essential element of the plaintiff's case, a nonsuit or directed verdict is proper. [Citations.]" (47 Cal.2d at pp. 514-515.) Although the rule is frequently recognized, it is seldom applied to defeat submission of the question to the trier of fact, because the jury or court, as the case may be, must determine the credibility and weight to be given the testimony concerning

the explanation. (See *Leonard* v. *Watsonville Community Hospital, supra,* 47 Cal.2d 509, 519; *Seeley* v. *Combs, supra,* 65 Cal.2d 127, 133-134; *DiMare* v. *Cresci* (1962) 58 Cal.2d 292, 298, 300 [23 Cal.Rptr. 772, 373 P.2d 860]; *Zentz* v. *Coca Cola Bottling Co., supra,* 39 Cal.2d 436, 449; *LaPorte* v. *Houston, supra,* 33 Cal.2d 167, 170; *Druzanich* v. *Criley, supra,* 19 Cal.2d 439, 444-445; *Baker* v. *B. F. Goodrich Co., supra,* 115 Cal.App.2d 221, 232-233; and *cf. Engstrom* v. *Auburn Auto. Sales Corp., supra,* 11 Cal.2d 64, 69-72.) More recently it has been held "To avoid the inference *as a matter of law* an individual doctor must go beyond showing that it was unlikely or not probable he was negligent and must establish that he is free from negligence by evidence which cannot be rationally disbelieved. Falling short of such a showing, it remains for the jury to determine whether the inference arising from the doctrine has been rebutted as to any particular doctor." (*Clark* v. *Gibbons,* 66 Cal.2d 399, 411 [58 Cal.Rptr. 125, 426 P.2d 525].)

"Just where testimony becomes 'clear, positive, uncontradicted and of such a nature that it cannot rationally be disbelieved' is, of course, a matter of judgment." (*Donahue* v. *Ziv Television Programs, Inc.* (1966) 245 Cal.App.2d 593, 598 [54 Cal.Rptr. 130].) It is clear that the trial judge in rejecting the plaintiff's proposed conditional instruction on res ipsa loquitur and in granting the motion for judgment either concluded that the plaintiff had presented insufficient evidence to give rise to the inference, or that it was rebutted by the explanation offered by the defendants' expert witness. ▮ The jury itself in finding that plaintiff's employer was negligent and that such negligence was a proximate cause of the accident (see fn. 1, *supra*), recognized that the manner in which the tire was mounted was a cause of the explosion. The only act or omission of the employer charged, upon which a finding of negligence could be made, was its failure to properly instruct plaintiff in the manner of mounting tires.[6] Under these circumstances the jury, in determining whether there was a defect in the tire, was not warranted in disregarding the uncontradicted testimony relating to the pressures and conditions necessary to produce an explosion of the nature of that which injured plaintiff. (See *Joseph* v. *Drew* (1950) 36 Cal.2d 575, 579 [225 P.2d 504]; *Inouye* v. *Black*

---

[6]There could of course be concurrent causes of mismounting and a defect in the tire. Plaintiff's evidence, however, fails to show a defect, or that if there was one, in what manner it contributed to the explosion.

(1965) 238 Cal.App.2d 31, 34-35 [47 Cal.Rptr. 313, 14 A.L.R. 3d 961]; *Krause* v. *Apodaca* (1960) 186 Cal.App.2d 413, 419 [9 Cal.Rptr. 10]; *Teich* v. *General Mills, Inc., supra,* 170 Cal. App.2d 791, 799-800; *Wirz* v. *Wirz* (1950) 96 Cal.App.2d 171, 176 [214 P.2d 839, 15 A.L.R.2d 1129]; *Boomer* v. *Southern Cal. Edison, supra,* 91 Cal.App. 375, 380-381; and *William Simpson Constr. Co.* v. *Industrial Acc. Com.* (1925) 74 Cal. App. 239, 242-243 [240 P. 58].)

The record fails to show that a finding of the existence of a defect in the tire which was a proximate cause of the explosion can be predicated upon more than speculation, as distinguished from a reasonable probability. The court properly granted the motion for judgment notwithstanding the verdict insofar as the judgment was predicated upon the theory that there was a defect in the tire.

IV. *Failure to Warn*

■ "A manufacturer, as well as a dealer, must give adequate warning to the ultimate users of the product of any dangerous propensity which it knows or should have known would result in the type of accident that occurred (*Crane* v. *Sears Roebuck & Co.,* 218 Cal.App.2d 855 [32 Cal.Rptr. 754])." (*Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 651. In addition to case cited see *Tingey* v. *E. F. Houghton & Co.* (1947) 30 Cal.2d 97, 102-103 [179 P.2d 807]; *Canifax* v. *Hercules Powder Co., supra,* 237 Cal.App.2d 44, 52-53; *Reynolds* v. *Natural Gas Equipment, Inc., supra,* 184 Cal. App.2d 724, 737-738; *Proctor & Gamble Mfg. Co.* v. *Superior Court* (1954) 124 Cal.App.2d 157, 162 [268 P.2d 199]; and Rest. 2d, Torts, § 402A.)

■ The evidence outlined above demonstrates that the manufacturer knew that a special hazard arose in mounting tube-type tires on safety or hump-type rims. There is evidence to show that the manufacturer disseminated, through posters and labels, instructions to lubricate the rims in mounting all types of tires. The record indicates that as a result of information learned during the tests, United States Rubber and other rubber manufacturers issued a poster with mounting instructions to avoid mismounting explosions.[7] Two copies of

---

[7] The poster stated: "Failure to follow correct mounting and demounting procedures can cause a serious—even fatal—accident! The methods described here must be followed for mounting or demounting tires on *all types* of drop center passenger car rims, whether on American or foreign cars."

Instructions included read in part: "*Warning!* If tire is not properly centered on rim, the tire bead may 'hang up' on one portion of the rim

the poster were sent by United States Rubber to all of its distributors, such as Gasoline Marketers, with the advice that additional copies could be furnished at cost and could either be ordered through United States Rubber or through the rubber manufacturers' association, for further distribution.

Commencing in 1962, United States Rubber Company adopted the practice of placing a sticker or tab on all passenger tires containing instructions for proper mounting procedures. The tag stated: "Mounting safety precautions: Lubricate and center bead, don't exceed 40 pounds P.S.I.; stand back when inflating."

Questions of fact were presented with respect to the issue of whether the manufacturer should have known that the general instructions to use a lubricant were more respected in the breach than by observance, and, if so, whether special warning should have been given of the particular hazard from safety rims.

The extent to which the general instructions were communicated to the retailer by the manufacturer and the distributor in this instance, and to the plaintiff himself, was also left in dispute because of conflicting evidence concerning the distribution of posters. The employee who instructed the plaintiff testified that no written instructions on the use of the mounting machine or on mounting tires were maintained in the room where the tires were mounted. The assistant manager testified that he had seen instruction posters similar to those disseminated by the manufacturer inside the store and in the service center prior to the accident. He could not recall that anywhere in the room where the tires were mounted. He stated that the only posters in that room before the accident were advertising posters; and that an instruction poster was placed by the tire-changing machine after the accident. The plaintiff

---

well or ledge. When this happens, inflation beyond 40 pounds pressure may break the bead (or even the rim) with explosive force, resulting in serious injury. *Do not stand over tire when inflating!* Use an extension gauge with clip-on chuck, and stand well back from tire for maximum safety! . . .

"*Inflation* Proceed with extreme caution! Be sure valve core is in valve. *Never exceed 40 pounds air pressure when inflating tire.* If 40 pounds pressure will not seat beads properly, deflate, relubricate, center tire on rim and reinflate. After beads are properly seated, reduce pressure to recommended operating pressure.

"*Mounting* 1. If rim is dirty or rusty, clean rim flanges and bead seats with emery cloth or steel wool. . . . 3. Lubricate tire beads, rim flanges, and bead ledge areas with *liberal* amount of thin vegetable oil soap solution or approved rubber lubricant . . . ."

and the manager testified that a placard[8] put out by the manufacturer of the tire-changing equipment was on the wall by the machine at the time of the accident. The plaintiff said he received no other written instruction; and the manager testified that no other instructions were posted prior to the accident. According to the manager the poster disseminated by the manufacturer was not received until after the accident.

The plaintiff offered several instructions on the failure to warn : one on the theory that ''the failure to give directions or warnings as to the use of a product to prevent it from being unreasonably dangerous,'' could render the product defective (see *Canifax* v. *Hercules Powder Co., supra,* 237 Cal.App.2d at p. 53) ; and two on the theory of negligence (see BAJI Instruction No. 155-A (rev.) and 218 (rev.) 2d par.).

There was substantial evidence to support a finding for the plaintiff on the foregoing issues, and it was error to withdraw them from the consideration of the jury. Since the evidence was conflicting there must be a new trial to resolve the questions of fact. As the facts on this theory are intertwined with those on the theory that there was a defect in the manufacturer of the tire, there should be a new trial on all the issues tendered by plaintiff's complaint as to both the manufacturer and the distributor.

The judgment is reversed and the case remanded for a new trial.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied April 23, 1968, and respondents' petition for a hearing by the Supreme Court was denied June 5, 1968.

---

[8]This placard read: ''Attention, on 14 inch wheels: Loosen beads and remove tires with the valve down on Chevrolet, Ford, Mercury and Edsel automobiles. Use a rubber lube for mounting and dismounting tires. Notice: Before inflating tube or tire to desired pressure remove clamping cone always! The Coates Company, Inc.''