[Civ. No. 29650.   Second Dist., Div. One.   Mar. 15, 1966.]

IRVING C. ERICKSON, Plaintiff and Appellant, v. SEARS, ROEBUCK & CO. et al., Defendants and Respondents.

Norman W. Gordon for Plaintiff and Appellant.

Kirtland & Packard and Robert L. Wilson for Defendants and Respondents.

WOOD, P. J.—This is an action for damages for personal injuries resulting when a wooden stepladder, on which plain-

tiff was standing, allegedly broke, fell over, and threw him to the ground. The ladder, which was sold to plaintiff by defendant Sears, Roebuck & Company, was manufactured by defendant Laddercraft Company. Upon motion of defendants, the judge directed the jury to return a verdict in favor of the defendants. Judgment, upon the directed verdict, was entered. Plaintiff appeals from the judgment and the order directing the verdict.

Plaintiff purchased a wooden stepladder, 6 feet in length— with five steps, from defendant Sears, Roebuck & Company on August 17, 1961, at the price of approximately $7.00. Soon thereafter he used the ladder, during a period of six weeks, while he was painting the inside of his house. Later, he used the ladder inside the house, during a period of two hours, while he was putting insulation material in the attic. On December 9, 1961, he used the ladder outside the house, about half an hour, while he was installing an aluminum water trough or gutter, about 7 feet long, under the lower edge of the roof of the back porch of his other house, which is on that same lot. The edge of the roof was about 8⅔ feet from the ground. Plaintiff was 5½ feet tall. After plaintiff had installed the trough, he wanted to inspect the installation to see how solid it was, and in order to do that, he went up the ladder to the third step and reached up toward the trough with his right hand, while his left hand was on the top of the ladder, and at that time the right rear leg of the ladder broke "completely," and the ladder fell over and threw him to the ground. He sustained personal injuries as a result of the fall.

About half an hour before the accident occurred, the plaintiff, for the purpose of stabilizing the ladder and keeping its legs from digging into the ground, nailed a strip of wood to the bottom ends of the front legs (step legs) of the ladder— the strip extended from one of the front legs to the other front leg; and he also nailed a strip of wood to the bottom ends of the two rear legs (or prop legs) of the ladder—the strip extended from one rear leg to the other rear leg. Each strip was about 1½ feet long and 1½ inches wide. The strip on the front legs was about ½ inch thick, and the strip on the rear legs was about 1 inch thick.

When plaintiff ascended the ladder to test the installation, the ladder was fully extended, and the front legs of the ladder were on a grass area, and the rear legs were in a planting area (about 4 feet wide) where Iris plants had been growing, but

the Iris, except for a plant between the front and rear legs of the ladder, had been removed and the area was practically clean—there were low-growing plants and some shrubbery directly behind or beyond the rear legs of the ladder. The ground in the planting area was not cultivated at that time, but it was not a hard surface—it was mostly "loam dirt" and it would not pack hard like adobe, but was more sandy. Plaintiff testified that at that time (when he ascended the ladder to inspect the work) the ladder was on firm ground; that the front legs were on grass on level and flat ground; that the rear legs were on semi-soft ground; that the "cleat" (or strip of wood) on the rear legs made the ground very firm; and that the front legs of the ladder were "on a little down hill," but the rear legs were "firmly balanced to the point where there was no wobble" that he (plaintiff) could see. Before plaintiff proceeded to ascend the ladder, he tested the ladder by putting his weight on the bottom step.

No one, other than the plaintiff, had used the ladder after plaintiff purchased it. When the ladder was not being used he kept it in the garage and it had not been exposed "to the outside."

The right rear leg of the ladder broke completely (in two) and straight across the width of the leg at a place about 1¾ feet from the bottom of the leg. The left rear leg broke completely and diagonally across the width of the leg, —the lower end of the break was about 3¼ feet from the bottom of the leg, and the upper end of the break was about 3¾ feet from the bottom of the leg.

On the side of the ladder there were directions regarding its use. Those directions, issued by Sears, Roebuck and Company, were in part as follows: "[P]lace ladder on a firm level foundation. Do not use on boxes or other unstable, slippery or soft surfaces." The ladder was received in evidence as plaintiff's exhibit 1.

Plaintiff did not offer expert testimony as to whether the ladder was defective.

Mr. Pickering, president of defendant Laddercraft, called as a witness by defendants, testified as follows: He had been engaged in the business of making ladders since 1931. He has sold ladders to Sears, Roebuck & Company since 1947. In constructing wooden ladders, according to permissible standards set by the U.S. Forest Laboratory and by the "American Standards," clear lumber (i.e., lumber without knots or sap pockets) should be used, and the slope of the grain in the rails

of a 6-foot ladder should not vary 1 inch in 12 inches. The ladder involved herein, which was made by defendant Laddercraft, meets those specifications, and there is no defect in the wood used in making the ladder. In his opinion, the breaking of the rear rails or legs of the ladder was caused by some dynamic force—some falling object or something of that nature, some sharp impact snapped them in two. In his experience in the ladder industry he has not seen cleats on the bottom of a ladder such as those "put on here." In his opinion, it is wrong to put such cleats on a ladder, because the ladder would teeter-totter if it is placed on an irregular surface. In his opinion, the "chipping" on the ladder was caused by "a nail being driven in here, the point of impact when the ladder collapsed, something had to give and, of course, it broke off." On cross-examination, he said that, assuming that the bottom strip were on flat ground, it is possible that the ladder would be more stable with the strip on it.

Mr. Beanfield, a consulting civil engineer, called as a witness by defendants, testified as follows: He is a past president of the Structural Engineers Association of California. He inspected the ladder (Exhibit 1), and in his opinion the wood in the rails of the ladder is "comparatively a straight grain, fir timber." He did not observe any defect in the wood. In his opinion, the ladder was constructed in accordance with good established practice in constructing ladders.

Plaintiff seeks recovery of damages from defendants upon the following alleged bases: negligence in the manufacture of the ladder; breach of implied warranty; and strict liability in tort.

Appellant (plaintiff) asserts in effect that there was substantial evidence from which the jury could have inferred negligence and breach of warranty. He argues to the effect that the doctrine of res ipsa loquitur was applicable: and that he was not required to present expert testimony that the ladder was defective, but that he could rely upon circumstantial evidence for such proof.

The doctrine of res ipsa loquitur is not applicable herein. Evidence on behalf of plaintiff established that approximately 30 minutes before plaintiff proceeded to use the ladder, on the day of the accident, he nailed a strip of wood, approximately 1½ feet long, 1½ inches wide, and 1 inch thick, on the bottom ends of the rear legs of the ladder—the strip extending from one rear leg to the other rear leg; and he also

nailed a similar strip of wood, approximately ½ inch thick, in a similar manner on the bottom ends of the front legs. Under such circumstances, the ladder was not in the same condition it was in when it was manufactured and was actually within the control of the manufacturer. If the structure of the ladder had not been changed by the purchaser (plaintiff), and if it was being used in the manner it was intended to be used, it might have been regarded in legal contemplation as being constructively within the control of the manufacturer. In view of the undisputed evidence that plaintiff changed the structure of the ladder, the judge did not err in concluding (as stated by him when ruling upon the motion) that the doctrine of res ipsa loquitur was not applicable.

The doctrine of strict liability in tort on the part of a manufacturer or retailer is set forth in *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897], and *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256 [37 Cal. Rptr. 896, 391 P.2d 168]. ■ "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman* v. *Yuba Power Products, Inc., supra,* p. 62.) A retailer is likewise strictly liable in tort. (*Vandermark* v. *Ford Motor Co., supra,* pp. 262-263.)

In the *Greenman* case it was said (p. 64) : "To establish the manufacturer's liability it was sufficient that the plaintiff proved that he was injured while using the Shopsmith [a power tool—saw, drill, and lathe] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the Shopsmith unsafe for its intended use."

■ It thus appears that a requirement precedent to the application of such doctrine is that the article which is the asserted cause of the injury was defective when manufactured or sold.

■ The burden was upon plaintiff to prove that the ladder was defective and that the defect was a proximate cause of the injury.

In the *Vandermark* case, *supra,* it is said (p. 260) : "[P]laintiffs were entitled to establish the existence of a defect and defendants' responsibility therefor by circumstantial evidence, particularly when, as in this case, the damage to the car in the collision precluded determining whether or not the

master cylinder assembly had been properly installed and adjusted before the accident.''

As above indicated, plaintiff's evidence on the subject of defectiveness was the ladder itself (Exhibit 1) and the circumstances under which it was used. He did not offer any expert testimony regarding the condition of the ladder. In all the cases cited in the briefs of the parties, regarding alleged defective articles, there was expert testimony, except in one case (*Crane* v. *Sears Roebuck & Co.*, 218 Cal.App.2d 855 [32 Cal. Rptr. 754]) wherein the article involved (''a surface preparer'') was volatile and dangerous (the article was used in preparing a surface for painting). In the *Crane* case (referred to as the exception), it was held that in view of the dangerous qualities of the product, the manufacturer had an independent duty of warning the public with respect to its use, and that the facts therein presented a question for the jury as to whether adequate warning was given. In the present case the ladder, of course, was not an inherently dangerous article.
■ It was not a legal requirement, however, that expert testimony be offered by plaintiff. As stated in the above quotation from the *Vandermark* case, the existence of a defect may be established by circumstantial evidence. A question herein was whether the evidence, considered in the light most favorable to plaintiff, established a prima facie case of strict liability in tort on the part of the manufacturer or retailer, within the rule indicated in the *Greenman* case—that the plaintiff was injured while he was using the ladder in a way it was intended to be used. As to the alleged existence of a defect, the ladder itself was placed in evidence as an exhibit, and there was testimony by plaintiff that when he was on the third step of the ladder, the right rear leg of the ladder broke completely and it seemed that ''everything went loose on it,'' and he was thrown to the ground. It can be determined from observation of the ladder, received in evidence as plaintiff's exhibit, that its two rear legs were broken in the places as hereinabove described. ■ As to whether plaintiff was using the ladder in a way it was intended to be used, there was testimony by plaintiff that within a few minutes before he used the ladder on the day of the accident he nailed strips of wood on the bottoms of the ladder legs in the manner above described; that he placed the rear legs of the ladder on the ground in a planting area where the ground, as described by him, was semi-soft, mostly loam dirt but more sandy than

. . .

adobe, and the strips of wood made the ground very firm; and that the front legs of the ladder were on grass on level and flat ground and ''on a little down hill''; and that the ladder was on firm ground. On the ladder there were printed directions, issued by Sears, Roebuck and Company, stating that the ladder should be placed on a firm level foundation, and should not be used on unstable or soft surfaces. It appears from plaintiff's testimony that shortly before the accident he had changed the condition of the ladder from the condition it was in when it left the manufacturer and the retailer, —that he improvised upon the manufacturer's design of the ladder, by nailing the strips of wood on the rear and front legs; and that he put the strips on the legs for the purpose of stabilizing the ladder and keeping its legs from digging into the ground. Based upon the conceded or undisputed facts as to the manner in which plaintiff changed and used the ladder, the trial court could properly conclude, as a matter of law, that at the time of the accident the plaintiff was not using the ladder in a way it was intended to be used, and that he had not established a prima facie case of strict liability in tort on the part of defendants. The court did not err in directing a verdict for defendants.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.