[Civ. No. 24570. First Dist., Div. Three. Jan. 8, 1970.]

ARTHUR GARCIA, a Minor, etc., et al., Plaintiffs and Appellants, v. RODNEY E. HALSETT, Defendant and Respondent.

## COUNSEL

Boccardo, Blum, Lull, Niland, Teerlink & Bell and Stanley A. Ibler, Jr., for Plaintiffs and Appellants.

Popelka, Graham, Van Loucks & Allard, Bernard J. Allard and Dean E. Stenberg for Defendant and Respondent.

## OPINION

**CALDECOTT, J.**—The plaintiffs appeal from a judgment in favor of the defendant following a jury trial.

On July 19, 1962, the appellant, Arthur Garcia, an 11-year-old boy, was injured in respondent's Happy Coin Launderette in San Jose. Respondent had owned the business since 1959. Launderette Sales designed the store layout and sold and installed all of the equipment. Respondent had nothing to do with the design of the store or with installation of the equipment. The facilities of the launderette included four rows of coin-operated washing machines. The machines were Philco-Bendix, front-loading, commercial washers. These machines have a washing cycle, three rinse cycles, two spin cycles, and one long extraction cycle. The last of these cycles is a spin cycle lasting 4½ to 5 minutes, during which the tub of the machine obtains a velocity of 370 revolutions per minute. The entire procedure lasts 30 minutes.

At the time of the accident, the machines were equipped with a circuit breaker, or reset button. The circuit breaker is a fuse, and has one purpose only: In the event of a short in the machine, or of a motor overload, which would create a heavy draw of current and consequently constitute a fire

hazard, the circuit breaker will break the circuit and stop the machine completely. If the circuit breaker button is depressed while the machine is running, it will stop the machine. However, the moment that the button is released the machine will start operating again. The circuit breaker is not used to stop the machine manually. Respondent testified that the manufacturer did not intend that this button should be used to stop a machine in order to reach into the loaded machine.

The appellant, Arthur Garcia, had been instructed by his mother as to how to run the machines and had been going there to wash clothes about once a week. He had also read the posted instructions regarding the loading of the machine.

The uncontradicted testimony of the appellants establishes that the accident took place in the following manner: On the date of the accident, Arthur went to the Happy Coin Launderette with his 10-year-old brother to do some laundry. When he entered the launderette he looked for available machines, and found machines 1 and 2 at the far end of the launderette. On prior occasions when he went to the launderette, he always used this same type of washing machine.

He took a portion of the clothes and put them in machine No. 1, and then inserted a quarter and started the machine. He then went to machine No. 2, put in the balance of the laundry, inserted a quarter, and started the second machine. Both machines started. In accordance with the posted instructions, he put soap in each machine, and began to read a magazine.

While he was sitting there, machine No. 2, the machine which he had started second, stopped. He actually saw the machine stop. Prior to that time, the machine had been spinning. He had seen it spinning through the window in the machine. The water had all drained out and it was clean; he could see through the window in the washer.

After machine No. 2 stopped, he waited until machine No. 1 stopped, three or four minutes later. He unloaded the clothes from machine No. 1. During this time machine No. 2 was stopped. He then went to machine No. 2 and began removing the clothes. The first batch of clothes he pulled out of machine No. 2 were "all dry, like spin dry." When he inserted his hand into the machine the second time, the machine made a funny noise and started up fast. When the machine started up, his arm became entangled in the clothing. His arm was twisted around and he himself was twisted around until he had his back to the machine.

Respondent Halsett testified that upon hearing Arthur's screams he came out of the office at the rear of the launderette. The quickest thing he could think of to do under the circumstances was to pull the plug,

which is located at the back of the machine. In order to pull the plug, he had to go over the top of the machine and reach down in back. He could have depressed the reset button, but as soon as one let go of the button, the machine would start up again.

When respondent returned to the launderette, after having taken Arthur home, he plugged in machine No. 2, and at that time the machine was in its fast spin cycle.

Respondent also testified that he thought the washing machine in question was perfectly safe and had all the safety features that were required. However, he also testified that the machine did not have a micro switch and that they were not available at that time.

A micro switch is a sensitive, pressure-activated switch which is placed across the main electrical circuit of the machine. It serves as a safety device. When activated, by opening the door, it completely shuts off the electricity going through the machine. The purpose of the micro switch is to prevent the machine from operating when the door is opened. Respondent admitted that if such a switch had been on the machine on the date of the accident, the machine could not have started spinning when Arthur opened the door and inserted his arm.

Micro switches sell for around $2.00. Shortly after the accident respondent obtained 12 of these micro switches and installed them himself on the machines. Experts for both appellants and respondent testified that micro switches had been on the market for a number of years.

Appellants' expert witness, an experienced appliance dealer, testified that, in his opinion, the washing machine in question was defective because, first, the timing mechanism was defective and, second, a 1958 Bendix commercial washer manufactured without a micro switch would be defective. If the machine was manufactured without a micro switch, a switch could be purchased and installed. This machine was defective because it did not have a micro switch on it. Other Philco-Bendix machines manufactured as early as 1952 had micro switches. Machines produced by other manufacturers have micro switches which serve as safety switches.

Appellants' expert witness also testified, in effect, that wear and tear resulting from years of use may result in a timer becoming faulty, thus causing the machine to stop during a cycle and then start again when the machine is jarred or the door opened.

The appellants contend that the trial court committed reversible error in that it refused to give the instructions offered by appellants on (1) bailment, and (2) strict liability.

## I

The appellants contend the trial court committed reversible error by refusing to give the instructions offered by appellants on the issue of bailment. There is no question raised as to the form of the instructions, only as to their applicability. The appellants' contention is without merit since the facts do not establish a bailment of the washing machine.

In order to constitute a bailment, possession of the article bailed must be given or delivered to the bailee. (*Porter* v. *Los Angeles Turf Club, Inc.,* 40 Cal.App.2d Supp. 840 [105 P.2d 956]; 7 Cal.Jur.2d, Rev., 377; Annot. 1 A.L.R. 394.) Appellants contend that appellant Arthur had at least constructive possession of the washing machine during the time he was using it. However, this argument is also without merit. Appellant Arthur assumed no responsibility for the safe-keeping of the machine, and did not have the right to remove it or tamper with the mechanical parts of the washer. Appellant merely acquired a license to use the washing machine and was not a bailee. (Cf. *Porter* v. *Los Angeles Turf Club, Inc., supra.*)

"The word 'license' generally speaking, means a grant of permission to do a particular thing, to exercise a certain privilege, or to carry on a particular business or to pursue a certain occupation. (*San Francisco* v. *Pacific Tel. & Tel. Co.,* 166 Cal. 244 [135 P. 971].)" (*Blatz Brewing Co.* v. *Collins,* 69 Cal.App.2d 639, 643 [160 P.2d 37].) License also means leave to do a thing which the licensor could prevent. (*Western Elec. Co.* v. *Pacent Reproducer Corp.,* 42 F.2d 116, 118.)

Since respondent could have prevented appellant Arthur from using the washing machines, and respondent impliedly gave Arthur permission to use them, Arthur merely had a license and cannot be considered a bailee of the machines.

## II

The appellants submitted proposed jury instructions on the issue of strict liability in tort which the court refused to give. Again, there is no contention that the form of the instructions was incorrect.

Appellants contend that even if no bailment existed, the doctrine of strict liability is applicable to the instant case. This contention is correct, and instructions on strict liability should have been given by the court.

Strict liability applies to the manufacturer of chattels which cause personal injury. (*Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) This liability

has been extended to retailers and distributors of chattels. (*Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168].) In the recent case of *McClaflin* v. *Bayshore Equipment Rental Co.,* 274 Cal.App.2d 446 [79 Cal.Rptr. 337], strict liability was imposed upon the lessor of a chattel. In *McClaflin,* plaintiff's decedent rented a ladder from defendant and subsequently died from injuries received when the leg of the ladder cracked, and decedent fell from it.

The precise legal relationship between the parties has not played a particularly significant role in the cases imposing strict liability. The court in *McClaflin* stated (p. 452): "The *Greenman* rule, moreover, extends its protection to the injured party without reference to the role he played, or even if he played none, in the transaction wherein the defective chattel was acquired from its purveyor. He can be a retail buyer (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 59), a member of the buyer's family (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 258), the buyer's employee (*Casetta* v. *United States Rubber Co.* (1968) 260 Cal.App.2d 792, 795 [67 Cal.Rptr. 645]), or a 'mere bystander' totally unconnected with the chattel's purveyor except as an ultimate victim. (*Elmore* v. *American Motors Corp., supra,* 70 Cal.2d 578, 580, 585-586 [75 Cal.Rptr. 652, 451 P.2d 84].)"

Respondent's argument would exclude from the protected class a person who has a license to use a product but has no control over it. Appellants' position in the present case is somewhat analogous to that of the innocent bystander protected in *Elmore* v. *American Motors Corp.,* 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84]. Appellant Arthur in the present case did not have control over the washing machine, or have the opportunity to inspect it for mechanical defects other than those which would be obviously apparent. In this regard, appellant Arthur is actually in a worse position than a retail buyer or member of the buyer's family, who arguably have an opportunity to inspect a product before buying and using it. Appellant Arthur's only choice was to pick, at random, a washing machine provided by respondent for use by the public. The fact that he picked one that may have had a latent defect should not bar his recovery for injuries sustained when the machine malfunctioned.

Licensors of personal property, like the manufacturers or retailers or lessors thereof, "are an integral part of the overall . . . marketing enterprise that should bear the cost of injuries resulting from defective products."

(*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 262; *McClaflin* v. *Bayshore Equipment Rental Co., supra,* 274 Cal.App.2d 446, 452.)

█ Although respondent is not engaged in the distribution of the product, in the same manner as a manufacturer, retailer or lessor, he does provide the product to the public for use by the public, and consequently does play more than a random and accidental role in the overall marketing enterprise of the product in question. Thus, the rationale of *Greenman* and *Vandermark* applies as logically and desirably to a licensor of chattels as to the manufacturers, retailers and lessors thereof. The trial court should have instructed on the issue of strict liability.

Respondent contends that there is no evidence of a defect and thus strict liability is not applicable in this case. █ However, it is well settled that a defect may be established by circumstantial evidence. (*Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d at p. 260; *Erickson* v. *Sears, Roebuck & Co.,* 240 Cal.App.2d 793, 799 [50 Cal.Rptr. 143].) █ The facts summarized above demonstrate that there was ample evidence from which it could be concluded that the machine in question was defective.

The judgment is reversed.

Draper, P. J., and Brown (H. C.), J., concurred.