Glenroy A. STREATCH,
Plaintiff,

v.

ASSOCIATED CONTAINER TRANSPOR-
TATION, LTD., Defendant.

ASSOCIATED CONTAINER TRANS-
PORTATION, LTD., Third Party
Plaintiff,

v.

CRESCENT WHARF & WAREHOUSE
COMPANY, a corporation, Third
Party Defendant.

CRESCENT WHARF & WAREHOUSE
COMPANY, a corporation, Counter-
Claimant,

v.

ASSOCIATED CONTAINER TRANS-
PORTATION, LTD., Counter-
Defendant.

No. CV 74-376-IH.

United States District Court,
C. D. California.

Jan. 22, 1975.

Newton R. Brown, Wilmington, Cal., for plaintiff.

Michael D. Dempsey, Lillick, McHose, Wheat, Adams & Charles, Los Angeles, Cal., for defendant and third party plaintiff.

Robert Sikes, North Hollywood, Cal., for third party defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

IRVING HILL, District Judge.

In this opinion, the Court considers whether a longshoreman who is injured aboard a vessel as a result of an alleged defect in a vehicle furnished by the vesselowner for loading and unloading cargo may assert a claim against the vesselowner for strict liability in tort. The question arises as a result of the Defendant's motion to dismiss the strict liability claim for failure to state a claim upon which relief can be granted. Defendant's principal argument is that a longshoreman's strict liability claim against a vessel is barred by the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972[1], now codified in pertinent part at 33 U.S.C. § 905(b)(Supp.1972). Counsel inform the Court, and the Court's research confirms, that this is a question of first impression in this country.

The Court holds that a vesselowner may be sued by a longshoreman on a strict liability theory. The Court, however, does not have before it now

---

1. Pub.L. No. 92–576, 86 Stat. 1251 (Oct. 27, 1972).

all the facts which may ultimately be determinative of whether the doctrine of strict liability is applicable to this vesselowner in this case. The Court, therefore, denies Defendant's motion to dismiss, but does so without prejudice to a reconsideration of whether the strict liability claim is appropriate in this particular case, which reconsideration can be had when the parties have fully investigated and developed all of the facts.

The facts now before the Court are taken in part from the allegations of the complaint (which for the purposes of a motion to dismiss are assumed to be true) and in part from fact statements orally made by counsel in the argument of this motion. The facts are these: Plaintiff is a longshoreman employed by a stevedoring company, Crescent Wharf & Warehouse Company. At the time of his injury, Plaintiff, in the course of his duties, was operating a motorized vehicle aboard the vessel "DILKARA" in the Port of San Pedro in this District. The vehicle was designed to load and unload the vessel's cargo of vans. The injury happened because the vehicle's brakes and steering failed, causing the vehicle to crash against a bulkhead.

The vehicle's ownership is not shown in the complaint but the vehicle was maintained and controlled by the vesselowner and carried aboard the vessel from port to port for use in handling the vessel's cargo. On the date of the injury, the vehicle had been provided by the vesselowner to the stevedoring company for use by the latter's employees in unloading the cargo of vans. The vehicle was provided to the stevedoring company "for consideration," which was in the form of a rebate or a reduction from the usual rate for stevedoring services.

Although the facts now before the Court reveal that the vesselowner was not the manufacturer of the vehicle, they do not show whether the vesselowner was in any other way involved in designing or building the vehicle. Nor is there any showing whether the vehicle was specially designed for use on this vessel alone or was designed for general use. The facts also do not reveal the nature of the agreement under which the stevedoring company was allowed to use the vehicle, whether there are similar vehicles that Defendant makes available in connection with the DILKARA or other vessels, or whether there is any other indication (such as use by Defendant of standardized printed license forms in connection with supplying vehicles) that Defendant is engaged in an organized and continuing business relating to cargo vehicles.

In order to rule on Defendant's motion to dismiss the strict liability claim, the Court must consider three issues: (1) whether, even absent the 1972 amendments affecting a longshoreman's rights, a strict liability claim is cognizable by a federal court under federal maritime law; (2) whether the 1972 amendments bar Plaintiff's strict liability cause of action; and (3) whether the vesselowner in this case has the requisite status with regard to the allegedly defective vehicle and the injured longshoreman to render the owner suable on a strict liability theory.

I

██ Since the Court in this case is exercising its admiralty or maritime jurisdiction, it must first decide whether the common law theory of strict liability for injuries caused by a defective product is or should be a part of federal maritime law.[2] Federal maritime law

2. Notwithstanding that 28 U.S.C. § 1332 (1970) (diversity of citizenship) is the jurisdictional basis relied upon by Plaintiff in his complaint, the case is governed by federal maritime law because it arises under the admiralty and maritime jurisdiction of this Court. See 28 U.S.C. § 1333 (1970); Victo-

ry Carriers, Inc. v. Law, 404 U.S. 202, 204, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 408–411, 74 S.Ct. 202, 98 L.Ed. 143 (1953). That jurisdiction attaches and makes federal maritime law applicable in tort cases in the federal courts involving maritime torts, that

has been derived mainly from historical admiralty principles as interpreted by the federal courts, and from statutes. But a widely accepted common law principle developed by the state courts can also be drawn into federal maritime law, especially when the principle is not contrary to federal legislation or admiralty law precedents. *Cf.* Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941); Igneri v. Cie. de Transports Oceaniques, 323 F.2d 257 (2nd Cir.), cert. den., 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1963).

■ Applying this rule of law, several federal courts, exercising their maritime jurisdiction, have held manufacturers of products liable for defects in manufacture or design. *E. g.,* Sears, Roebuck and Co. v. American President Lines, Ltd., 345 F.Supp. 395 (N.D.Cal. 1971); Montgomery v. Goodyear Tire & Rubber Co., 231 F.Supp. 447 (S.D.N.Y. 1964); Middleton v. United Aircraft Corp., 204 F.Supp. 856 (S.D.N.Y.1960). These holdings enunciate a theory of recovery based on breach of implied warranty, a contracts concept. On analysis, however, it seems to this Court that they are not and could not be contract holdings. It would have been a jurisdictional impossibility to impose contractual liability in these cases since the contracts that would have been at issue were non-maritime. Only maritime contracts can furnish the jurisdictional basis for maritime contract litigation in the federal courts. See Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922); 7 ALR Fed. 502 (1971).

■ The Restatement of Torts and other authorities have commented that the use of warranty concepts and language in this type of situation is a misnomer, an unfortunate attempt to provide a familiar basis and nomenclature for what is actually a tort theory of

strict liability. *Cf.* Restatement (Second) of Torts § 402A, comment m (1965). Thus, this Court regards the above cited federal cases as precedents for applying strict liability in tort within the federal admiralty jurisdiction. Accord, 7 ALR Fed., *supra* at 511.

## II

Given that strict liability is cognizable under federal maritime law, the Court must next consider whether a longshoreman's strict liability claim against a vessel is nonetheless barred by the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972. The relevant section reads in part:

"In the event of injury to a person covered under this chapter caused by the *negligence of a vessel,* then such person . . . may bring an action against such vessel as a third party . . . and the *employer shall not be liable to the vessel* for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the *warranty of seaworthiness* or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be *exclusive of all other remedies* against the vessel . . . ." 33 U.S.C. § 905(b) (Supp.1972) (emphasis added).

■ The main purpose of the 1972 amendments, of which the above section is a part, was to raise the level of compensation benefits payable to an injured longshoreman by his employer. See H. R.Rep. No. 92–1441, 92d Cong., 2d Sess., U.S.Code Cong. & Admin.News, p. 4698 (1972). During the hearings on the proposed legislation, it became apparent that one of the principal causes of resistance to increasing the level of compensation benefits was the potential

is, torts occurring on navigable waters. See *Victory Carriers, Inc., supra* 404 U.S. at 205, 92 S.Ct. 418. The fact that diversity can also be alleged as the basis of jurisdic-

tion does not make the forum state's law applicable. See *Pope & Talbot, Inc., supra* 346 U.S. at 409–411, 74 S.Ct. 202.

additional liability of an employer to indemnify a vessel that had been held liable to an injured longshoreman on a claim of unseaworthiness, whenever the unseaworthy condition was in fact caused by the employer. See H.R.Rep. No. 92–1441, *supra*; *cf.* Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S. Ct. 872, 90 L.Ed. 1099 (1946) (extended a vesselowner's obligation of seaworthiness, traditionally owed to seamen, to a longshoreman who is injured while aboard and loading the vessel); Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) (permitted the vesselowner to cross-claim the stevedoring company for indemnity where the longshoreman collected against the vessel for an injury in fact caused by the stevedoring company's breach of its obligation to stow the cargo properly and safely). At hearings held in both houses of Congress, the Secretary of Labor pointed out that the ability of vessels to cross-claim the employer constituted a "circuity" of actions that (1) often resulted in much greater liability for the employer than he owed under the then existing compensation schedules, and (2) resulted in expensive litigation that cost the longshoreman much of what he would win and introduced huge inefficiencies into the compensation scheme. Hearings Before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare on the Longshoremen's and Harbor Workers' Act Amendments of 1972, 92d Cong., 2d Sess. 28–33 (1972); Hearings Before the Select Subcommittee on Labor of the House Committee on Education and Labor on the Longshoremen's and Harbor Workers' Act Amendents of 1972, 92d Cong., 2d Sess. 46–50 (1972).

To overcome the problem, Congress could have eliminated only the ability of vessels to cross-claim the employer, leaving to injured longshoremen their unseaworthiness action against the vessel. But in view of the increase in compensation levels that was to be afforded longshoremen by the amendments, Congress decided to do away with all unseaworthiness claims brought by longshoremen. Congress also thought that eliminating the longshoreman's unseaworthiness claim would be fairer (especially to vesselowners) than eliminating only the vesselowner's right of indemnity.

While eliminating longshoremen unseaworthiness claims, Congress rejected proposals to eliminate a longshoreman's negligence claim against the vessel. The congressional reports indicate a concern for preserving a vessel's negligence liability as an incentive to vesselowners to exercise due care. The House and Senate Reports also both state that the purpose of the amendments was to take away only the longshoreman's special maritime theory of recovery and to leave him in the same position as a non-maritime worker:

> "The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore . . . and not to endow him with any special maritime theory of liability . . . ." H.R.Rep. No. 92–1441, *supra* at p. 4703; S.Rep. No. 92–1125, 92d Cong., 2d Sess. (1972).

In the context of the longshoreman's rights against the vessel, Congress was dealing with a pre-existing situation in which there were two possible theories of action: negligence and unseaworthiness. In the new act, Congress restated and reaffirmed the liability of the vessel to the longshoreman for negligence (while denying to the vessel a cause of action for indemnity against the longshoreman's employer). Congress, on the other hand, specifically took away the longshoreman's other cause of action, *i. e.,* unseaworthiness. And as if to underscore this taking away, it provided that the longshoreman's negligence remedy would be "exclusive of all other remedies against the vessel." 33 U.S.C. § 905(b) (Supp. 1972).

■■ The Court feels that this language must be read in a way that would be consistent with the clearly expressed intention to put the longshoreman "in the same position" as if he were injured in non-maritime employment ashore. To do so, it is necessary to construe the words "exclusive of all other remedies" to apply only to remedies against the vesselowner *qua* vesselowner. Other causes of action which the longshoreman might have against the vesselowner based on other theories, which causes of action he would have if similarly injured in non-maritime employment ashore, are not affected. Thus, the Court reads the statute so that longshoremen are able to sue a vessel for strict liability in the same situations in which a non-maritime worker could sue for strict liability. As noted below, to be suable on a strict liability claim, a defendant must be in the business of distributing the allegedly defective product to the public. If a vesselowner is in that business, the cause of action arises against him not *qua* vesselowner but *qua* provider of a defective product.

Defendant seizes upon a short sentence in the legislative history as pointing to a contrary result. Both House and Senate Committee Reports state: "The Committee also rejected the thesis that a vessel should be liable without regard to its fault for injuries . . . ." H.R.Rep. No. 92–1441, *supra* at p. 4702; S.Rep. No. 92–1125, *supra*. Defendant urges the Court to read this sentence as precluding longshoremen claims of strict liability against a vessel.

■■ Given the pre-existing situation that Congress was dealing with, however, the Court believes that the above quoted sentence is merely an imprecise way of stating that the Committee was proposing to end unseaworthiness liability of a vessel to a longshore-

man. It is only an unintended coincidence that strict liability in tort has also sometimes been described as liability of a party "without regard to its fault." Equating the two theories of recovery is not accurate; there are important differences between them. Liability for unseaworthiness is sweeping and unconditional. Vesselowners are liable for injuries resulting from failure to provide a seaworthy vessel, regardless of the nature of the condition or its cause. It has been characterized by the Supreme Court as "a form of absolute duty . . . ." *Seas Shipping, supra,* 328 U.S. at 95, 66 S.Ct. 872. Strict liability in tort, on the other hand, is not such a broad and absolute liability. For example, it can be asserted only against those who are in the business of distributing the allegedly defective product to the public. Under it, moreover, a defendant is liable only for defects in the design and manufacture of the product and, as further limited by the Restatement, *supra*, only for defects that render the product unreasonably dangerous.[3]

Thus, it can be argued that strict liability in tort does not fall within the Congressional rejection of the liability of a vessel "without regard to its fault." But the more persuasive argument is the one stated above, *i. e.*, that the language used by the congressional committee was an imprecise synonym for unseaworthiness liability. The language will thus not be construed to bar the instant claim, especially in view of Congress' more precisely stated intention "to place [a longshoreman] injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore . . . ."

### III

Having decided that a claim of strict liability in tort is cognizable under fed-

---

3. The Court is aware that the Supreme Court of California has rejected the "unreasonably dangerous" requirement, Cronin v. J. B. E. Olson Corporation, 8 Cal.3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972). The Court is not required at this time to determine whether, under federal maritime law in this case, the "unreasonably dangerous" requirement does or does not apply.

eral maritime law and that the 1972 amendments do not bar a longshoreman's strict liability cause of action against the vesselowner, the Court must finally consider whether, on the particular facts of this case, the relationship of the vesselowner to the Plaintiff with respect to the vehicle in question makes the vesselowner a proper defendant within the definitional limits of strict liability in tort. Unfortunately, this question was not briefed by the parties at all and the parties have not yet furnished a complete factual statement on this aspect of the case. But the Court nevertheless has before it a motion to dismiss which it must decide on the facts now before it, incomplete as they may turn out to be.

Attention is again directed to the fact statement above, and particularly to the areas where no detailed facts are yet known. As already noted, these missing detailed facts may be important and even determinative in a later motion for summary judgment.

The Court has found no case in which a vesselowner was held liable under federal maritime law to a longshoreman or to a business visitor on a theory of strict liability.[4] Although federal maritime law recognizes products liability claims, the relevant cases have all involved claims against the manufacturer or retailer of the allegedly defective product. In this case, the Defendant is not the manufacturer of the item, nor is the Defendant its distributor in the usual sense of that term. So it is necessary to explore the extent of the reach of the doctrine of strict liability in tort. With no precedent in the federal maritime law for holding any vesselowner

under this theory, much less for holding a vesselowner who is neither a manufacturer nor the typical distributor, this Court must examine the common law as developed by the state courts for guidance.[5]

It is appropriate to look at the way in which the doctrine of strict liability in tort developed and the rationale given for its development by leading courts and the Restatement. The doctrine originated in cases against manufacturers; see, e. g., Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), in which the Supreme Court of California explained:

> "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."

The Restatement (Second) of Torts, supra, comment f, added:

> "The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger [their] . . . safety . . . , and the forced reliance upon that undertaking on the part of those who purchase such goods."

The rationale given for the doctrine laid the groundwork for its broader application, including cases against wholesalers and retailers. E. g., Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964); see Restatement (Second) of Torts, supra,

---

4. This absence of authority undoubtedly results from the fact that before 1972 a longshoreman could assert an unseaworthiness claim against the vessel that would cover all such cases. So in this respect, as in respect to the interpretation of the 1972 amendments, this case is one of first impression.

5. This part of the opinion relies exclusively on California precedents and the Restate-

ment of Torts. The California appellate courts have been national leaders in the development and elaboration of the law in this field. Moreover, the decisions of the courts of the forum state are of special significance to a federal court in this type of situation. See Watz v. Zapata Off-Shore Company, 431 F.2d 100, 113 (5th Cir. 1970).

comment f. As the Court said in *Vandermark, supra,* 61 Cal.2d at 262–263, 37 Cal.Rptr. at 899, 391 P.2d at 171:

"Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. . . . Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship."

From these decisions, the underlying public policy and social justification for imposing strict liability appears to pertain only to those people engaged in the *business* of *providing a product to the public for use by the public.* Only then would a court be justified in imposing the added responsibility, and assured that defendant could spread the added cost.

Relying and expanding upon these rationales, lessors, bailors and licensors have more recently been held answerable to a strict liability claim. *E. g.,* Price v. Shell Oil Co., 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970) (lessor-bailor); Fakhoury v. Magner, 25 Cal.App. 3d 58, 101 Cal.Rptr. 473 (1972) (lessor); Garcia v. Halsett, 3 Cal.App.3d 319, 82 Cal.Rptr. 420 (1970) (licensor). In *Price, supra,* 2 Cal.3d at 251–252, 85 Cal.Rptr. at 182, 466 P.2d at 726, the Court said:

"[W]e can perceive no substantial difference between *sellers* of personal property and *non-sellers,* such as bailors and lessors. In each instance, the seller or non-seller 'places [an article] on the market, knowing that it is to be used without inspection for defects, . . . .' In the light of the policy to be subserved, it should make no dif-

ference that the party distributing the article has retained title to it. . . . The [non-sellers], like the [sellers], are able to bear the cost of compensating for injuries . . . by spreading the loss through an adjustment of the rental."

The cases that extend the doctrine to non-sellers such as bailors, licensors and lessors seem to make it clear that not all such persons are subject to strict liability in tort. The twin requirements of the original cases are particularly emphasized in this context, *i. e.,* that the defendant must be in the *business* of providing the product and that he must provide the product *to the public for use by the public.* As stated in *Price, supra,* 2 Cal.3d at 254, 85 Cal.Rptr. at 184, 466 P.2d at 728:

"Our analysis of [the] authorities leads to the conclusion that for the doctrine of strict liability in tort to apply to a lessor of personalty, *the lessor should be found to be in the business of leasing,* in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing." (Emphasis added.)

And, as said by the court in *Garcia, supra,* 3 Cal.App.3d at 326, 82 Cal.Rptr. at 423:

"Although [a licensor of chattels] is not engaged in the distribution of the product, in the same manner as a manufacturer, retailer or lessor, *he does provide the product to the public for use by the public,* and consequently does play more than a random and accidental role in the overall marketing enterprise of the product in question." (Emphasis added.)

Unfortunately, there is not as yet any refinement of what is meant either by engaging in the "business" of supplying products [6] or by supplying products "to the public."

**6.** Restatement (Second) of Torts, *supra,* comment f, states:

"The rule does not, however, apply to the occasional seller of food or other such

products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of

As it now appears, the Defendant in this case may well be a licensor of the vehicle. As such, Defendant may be placing the vehicle on the market or in the stream of commerce by distributing it to the ultimate user. Moreover, the Court at this time and in this posture of the case cannot find a lack of the "business" requisite. The Defendant allows the vehicle to be used for its business benefit and obtains a consideration therefor. The Defendant may also be engaged in a continuity of transactions involving the commercial licensing of this and similar vehicles. On the other hand, this may be an isolated transaction. The vehicle may also be a singular vehicle designed and used only on this ship and in a few ports. Such facts as may be later developed on these issues will be important in finally determining whether the requisite "business" exists.

Such facts also may affect whether the Defendant meets the requisite of distributing a product "to the public for use by the public." If there is involved in that concept the notion of distribution to a numerous, undefined and uninformed group of users, this aspect may be lacking in the present case. At first glance, it appears that this vehicle is not intended for any "public" use at all. The vesselowner apparently intends it to be used on the vessel by a presumptively knowledgeable and strictly limited class of user. Again, however, the Court does not feel free to grant a motion to dismiss without full development of all the facts and will undoubtedly have a further opportunity to consider the same question at or before the trial after the facts are fully known.

Pursuant to the above, it is ordered as follows:

Defendant's Motion to Dismiss is denied.

jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor . . . ."

On the other hand, it is clear that the "business" referred to need not be the main business or the *raison d'etre* of the defendant.

In *Price, supra,* for example, the Shell Oil Company was held to be in the business of leasing trucks and thus answerable to a strict liability claim for injuries caused by an allegedly defective ladder attached to one of the trucks it had leased.