[No. C052420. Third Dist. Nov. 6, 2006.]

D.J. NELSON, as Trustee, etc., Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
EXXON MOBIL CORPORATION, Real Party in Interest.

**COUNSEL**

Baron & Budd, Scott Summy, Celeste A. Evangelisti, John L. Yates, Stephen Blackburn; Sher & Leff, Victor M. Sher, Todd Eric Robins; Stevens & O'Connell, Charles J. Stevens, David A. Cheit and Bradley A. Benbrook for Petitioner.

No appearance for Respondent.

Sheppard, Mullin, Richter & Hampton, Jeffrey J. Parker, Lori Osmundsen, Whitney D. Jones; McDermott Will & Emery, Peter J. Sacripanti, Michael R. O'Neill and Rory K. Little for Real Party in Interest.

**OPINION**

**BLEASE, Acting P. J.**—This is a petition for writ of mandate in a civil case. Petitioner and plaintiff D.J. Nelson Trust owns and operates Fruitridge Vista Water Company. Real party in interest and defendant Exxon Mobil Corporation refined gasoline containing the additive methyl tertiary butyl ether (MTBE), which was supplied to gas stations near plaintiff's water

system. Plaintiff claimed MTBE leaked into its water system from the stations and asserted causes of action against defendant for strict liability, negligence, trespass, and nuisance. The trial court granted a defense motion for judgment on the pleadings on the strict liability cause of action.

In this petition, plaintiff claims the court erred and asserts that the case should proceed to trial on all causes of action. We agree. To preclude further litigation that could result in a costly second trial, we shall grant the requested relief. (See *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 319 [7 Cal.Rptr.3d 628]; *Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1183 [272 Cal.Rptr. 304].)

## Factual Summary

" 'A motion for judgment on the pleadings performs the same function as a general demurrer, and hence attacks only defects disclosed on the face of the pleadings or by matters that can be judicially noticed.' " (*Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1064 [20 Cal.Rptr.3d 562], quoting *Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 999 [79 Cal.Rptr.2d 544].) Accordingly, "[w]e accept as true the complaint's factual allegations and give them a liberal construction." (*Burnett v. Chimney Sweep*, *supra*, 123 Cal.App.4th at p. 1065, citing *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516 [101 Cal.Rptr.2d 470, 12 P.3d 720].) Here, the defense motion challenged the fifth amended complaint. The following summary (including quotations) is taken from the allegations therein.

Defendant refined gasoline containing MTBE,[1] which was supplied to certain gas stations (that defendant did not itself operate) in the area of Fruitridge's groundwater wells. Gas stored at these stations leaked into the soil and contaminated plaintiff's water system with MTBE. As a result, plaintiff incurred significant expense, loss, and damage associated with taking steps to remove MTBE from its system and to secure alternative water supplies.

Defendant knew or reasonably should have known that gasoline distribution and retail systems statewide included leaking gasoline delivery systems.

---

[1] Many of the factual allegations in the fifth amended complaint refer to methyl tertiary butyl ether (MTBE, which the complaint describes as including related contaminants) *"and/or"* another related chemical, tertiary butyl alcohol (TBA). Presumably for simplicity's sake, the parties and the trial court ordinarily refer only to "MTBE" in the pleadings and decision at issue. According to the fifth amended complaint, "TBA is variously a gasoline constituent, an impurity in commercial grade MTBE, and a degradation or breakdown product of MTBE." Considering these facts, we shall likewise simply refer to the potential environmental contaminants as MTBE.

More specifically, defendant knew or reasonably should have known that facilities, including those in the vicinity of plaintiff's water system, commonly lacked adequate storage facilities for gasoline containing MTBE. Further, defendant knew or should have known that operators of these facilities were unaware of either the special hazards of MTBE or the steps necessary to eliminate or mitigate those hazards.

Defendant knew that release of MTBE was inevitable because a substantial percentage of gas stations "would store such gasoline without taking reasonable, appropriate or special precautions, such as by placing the gasoline in inadequate and leaking gasoline delivery systems, and without taking reasonable, appropriate or special measures to monitor, detect, and respond to" the release of MTBE.

Defendant knew or reasonably should have known MTBE "would mix easily with groundwater, move great distances, resist biodegradation or bioremediation, render drinking water unsafe and/or unpotable, cause significant expenses to remove from public drinking water supplies, and otherwise threaten the public health and welfare." MTBE has "a strong affinity for water." Once released into the subsurface, MTBE "separate[s] from other gasoline constituents in the presence of moisture." MTBE spreads "farther and faster than other components of gasoline," and is resistant to biodegradation. It can "migrate through the soil, the groundwater, penetrate deeper within the acquifer [sic], and cause persistent contamination that can threaten the potability of drinking water wells." MTBE makes drinking water "putrid, foul, and unfit for purveying to consumers" even if the MTBE is only present at low levels. Further, MTBE is a carcinogen that is a threat to public health.

Defendant "chose not to warn customers, retailers, regulators or public officials, including Fruitridge" of the risks of MTBE contamination. Defendant represented to purchasers of gasoline containing MTBE, the public, and government agencies that it was environmentally sound and appropriate for widespread distribution, sale, and use. In fact, defendant "represented that gasoline containing MTBE could be handled the same as ordinary gasoline, and required no special measures to protect against or respond to suspected releases to the subsurface."

### Motion for Judgment on Pleadings

Plaintiff alleged strict liability based on a defect in the design and manufacture of MTBE (specifically asserting the benefits of MTBE are greatly outweighed by its costs and negative impact) and by defendant's

failure to adequately warn of its dangers. Defendant and other refiners[2] moved for judgment on the pleadings on this cause of action, claiming strict liability did not apply because plaintiff was not harmed by a use of the product (the MTBE-laden gasoline) after it had reached an *ultimate consumer or user*. The defense also argued that applying strict liability in these circumstances was inconsistent with its purpose and that existing law provided ample alternative means for plaintiff to pursue its claims.

The trial court granted the defense motion, citing case law emphasizing that the strict liability doctrine was developed mainly to protect consumers, users, and (to some extent) bystanders who are not in a position to protect themselves. The court noted it had "found no case authority supporting the proposition that a bystander who is injured by a product not as a result of the use, consumption or even possession of the product by a user or consumer, may avail itself [of] the additional protections of the law of strict products liability." The court found it dispositive that there was no allegation that fuel containing MTBE was improperly released into the ground and groundwater "by virtue of the service stations' use or consumption of the fuel as a product." The court observed: "While California law permits bystanders injured by a product, in certain circumstances, to recover under strict product liability, it has apparently only been when that injury was attendant to the use or consumption of the product, not while the product was still possessed and stored by a participant in the stream of commerce."

## Writ Proceedings

The trial court granted the motion for judgment on the pleadings on April 14, 2006. On April 19, plaintiff filed the instant petition for writ of mandate and request for an immediate stay of the pending trial. On April 21, this court advised the parties that it was considering issuing a peremptory writ in the first instance and that any opposition was to be filed on or before May 1. This court also stayed the pending trial. This court subsequently granted an extension of time for defendant to file its opposition, which was filed on May 11. Plaintiff filed a reply on May 22. On its own motion, this court heard oral argument on September 22, 2006.

## Discussion

Defendant argues that strict liability does not apply under California law unless the plaintiff's injury was caused by a consumer use of the allegedly defective product. By consumer, defendant means the "ultimate" consumer or user. We disagree. As we shall explain, strict liability broadly extends to

---

[2] Other defendants apparently have agreed to a settlement and are not parties to this writ.

products that have left control of the manufacturer and are placed on the market. Thus, foreseeable uses of gasoline reasonably include storing it at a gas station, transferring it through gas pumps into a vehicle, and storing it in a vehicle's tank before it is actually burned as fuel. Permitting injured third parties or "bystanders" to recover for damages associated with any of these uses is consistent with strict liability doctrine in this state. We begin with a brief review of the strict liability doctrine and its underlying policy rationale, with particular emphasis on bystander liability.

 "The elements of a strict products liability cause of action are a defect in the manufacture or design of the product or a failure to warn, causation, and injury." (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 318 [40 Cal.Rptr.3d 313], citing *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298].) More specifically, plaintiff must ordinarily show: " '(1) the product is placed *on the market*; (2) there is knowledge that it will be *used* without inspection for defect; (3) the product proves to be defective; and (4) the defect causes injury . . . .' " (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 415 [9 Cal.Rptr.3d 242], italics added.)

 Significantly, state law does not restrict liability to cases arising after a retail sale or equivalent transaction, which might imply a more limited class of potential, expected uses. "[I]n California, a sale of the product is not necessary for imposition of products liability; the object must be 'placed on the market, knowing that it is to be used without inspection for defects . . . .' " (*Stein v. Southern Cal. Edison Co.* (1992) 7 Cal.App.4th 565, 570–571 [8 Cal.Rptr.2d 907], quoting *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 250 [85 Cal.Rptr. 178, 466 P.2d 722].) This is an important deviation from the Restatement Second of Torts and continues to distinguish California law from other jurisdictions, where a sale or equivalent transaction is required.[3] (*Stein v. Southern Cal. Edison Co., supra,* 7 Cal.App.4th at p. 570; cf. *Thiele v. Faygo Beverage, Inc.* (Ind.Ct.App. 1986) 489 N.E.2d 562, 585–587.)

---

[3] Defendant has suggested that case law concerning strict liability by electricity producers supports the conclusion that the product must reach the ultimate consumer. These cases are inapposite as they focus on the virtually unique question of when and under what circumstances electricity can be considered a *product* that has been placed *in the stream of commerce.* (See *Stein v. Southern Cal. Edison Co., supra,* 7 Cal.App.4th at p. 571; *Pierce v. Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68, 81–84 [212 Cal.Rptr. 283]; *Fong v. Pacific Gas & Electric Co.* (1988) 199 Cal.App.3d 30, 38 [245 Cal.Rptr. 436]; see also *Streatch v. Associated Container Transp., Ltd.* (D.C.Cal. 1975) 388 F.Supp. 935, 942 [policy underlying strict liability pertains to those in the business of providing a product for use by the public].) There is, of course, no question here that gasoline containing MTBE was a "product" that was actually "on the market," having left control of defendant and reached the marketplace.

California law in this area stems from the decision to allow bystanders to recover in strict liability. (See *Price v. Shell Oil Co., supra,* 2 Cal.3d at pp. 250–251.) Our state Supreme Court observed that this state's "broad philosophy evolves naturally from the purpose of imposing strict liability which 'is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' " (*Id.* at p. 251.) In fact, the court pointed out that, if anything, bystanders should be given greater protection than consumers and users where harm to bystanders from a defect is reasonably foreseeable. (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 586 [75 Cal.Rptr. 652, 451 P.2d 84].) The *Elmore* court emphasized: "Consumers and users, at least, have the opportunity to inspect for defects and to limit their purchases to articles manufactured by reputable manufacturers and sold by reputable retailers, whereas the bystander ordinarily has no such opportunities." (*Ibid.*) Further, the court cited authority pointing out that injuries to bystanders are often perfectly foreseeable risks of the enterprise. (*Ibid.*)

█ It is self-evident that bystanders to uses of a product while it is still on the market are in the same position vis-à-vis the manufacturer as bystanders to uses of the product by the ultimate consumer, i.e., both are powerless to protect themselves. Considering the purposes of bystander liability and the fact that California law applies to products once they are placed on the market, the class of uses that may be foreseen by the manufacturer must necessarily be quite broad. If a manufacturer may be required to reasonably foresee misuse or abuse of a product by a user or third party in some circumstances (see Judicial Council of Cal., Civ. Jury Instns. (2006) CACI Nos. 1203, 1204, 1205; *Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 833 [20 Cal.Rptr.2d 296]), the same manufacturer should also foresee normal storage and movement of the product while it is still on the market.

Consideration of other underlying policy rationales for strict liability supports our conclusion. In addition to ensuring costs of injuries from defective products are borne by the manufacturer rather than by injured persons who are powerless to protect themselves, strict liability was created " '(1) to provide a "short cut" to liability where negligence may be present but difficult to prove; (2) to provide an economic incentive for improved product safety; (3) to induce the reallocation of resources toward safer products; and (4) to spread the risk of loss among all who use the product.' " (*Barrett v. Superior Court, supra,* 222 Cal.App.3d at p. 1186, quoting *Pierce v. Pacific Gas & Electric Co., supra,* 166 Cal.App.3d at p. 83.)

Only the first of these goals requires further comment. Specifically, the availability of strict liability helps ensure that a manufacturer is responsible

for a product even if liability might be difficult to show under a negligence theory.[4] (See *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1003–1004 [281 Cal.Rptr. 528, 810 P.2d 549] [strict liability does not focus on reasonableness of manufacturer's failure to warn if danger known to scientific community]; *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 434 [143 Cal.Rptr. 225, 573 P.2d 443] [analysis of design defect focuses on condition of product and not reasonableness of manufacturer's conduct].)

In short, there is no basis for a narrow construction of the class of "user" that supports imposition of strict liability. Our conclusion is consistent with case law recognizing, in other contexts, that there are reasonably foreseeable incidental and attendant uses of a product, such as storage and disposal. (See *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1622 [271 Cal.Rptr. 596], quoting *Boyl v. California Chemical Company* (D.Or. 1963) 221 F.Supp. 669, 674.)

*Moreno v. Leslie's Pool Mart* (1980) 110 Cal.App.3d 179 [167 Cal.Rptr. 747], is also instructive.[5] In that case, a "stock boy" was injured when disposing of unlabeled containers of pool chemicals that were leaking. (*Id.* at pp. 180–181.) He emptied a partial bottle of muriatic acid into a partial bottle of chlorine, causing fumes that resulted in his injury. (*Id.* at p. 181.) In holding the suit could go forward, the appellate court relied on an earlier case in which an employee had used defective scaffolding manufactured by his employer. (See *id.* at pp. 181–182.) The employer in *Moreno* tried to distinguish the earlier case by arguing the employee was not actually *using* the bottles of chemicals as a tool at the time of the injury but was simply moving them. (*Id.* at p. 182.) The appellate court rejected this argument, observing that moving the bottles "was a 'use' to be expected and was, for the purposes of this case, as much a 'use' as was climbing the defective scaffold in [the earlier case]." (*Ibid.*)

---

[4] Defendant suggests that strict liability should not apply because plaintiff has other avenues for pursuing relief against defendant and others. But, as noted above, the doctrine helps fill gaps left open by other theories such as negligence. And there is no requirement that a plaintiff elect between strict liability and alternative legal theories. (See *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681].)

[5] *Moreno v. Leslie's Pool Mart, supra,* 110 Cal.App.3d 179, arose from the so-called "dual capacity" doctrine. "Dual capacity" was a judicially created doctrine that allowed an employee to sue his or her employer and obtain relief outside of the workers' compensation scheme, provided that the suit was based on a legal theory other than the employer-employee relationship. (See *Douglas v. E. & J. Gallo Winery* (1977) 69 Cal.App.3d 103, 113 [137 Cal.Rptr. 797].) This type of suit is now restricted by statute. (See Lab. Code, § 3602.) But dual capacity cases are still persuasive authority to the extent they discuss the general scope of strict liability doctrine. The current statute merely restricts the rights of *workers* seeking relief from their employers to the workers' compensation scheme. (See Lab. Code, § 3602, subds. (a), (c).) It has absolutely no bearing on the scope of strict liability where persons other than an employee are injured.

Before concluding, we address this court's recent decision in *Souza v. Squaw Valley Ski Corp.* (2006) 138 Cal.App.4th 262 [41 Cal.Rptr.3d 389], which defendant suggests is directly on point and contrary to our conclusion. In that case, this court upheld a decision to grant summary judgment against a child skier who was injured when she lost her balance and hit a snowmaking hydrant. (*Id.* at p. 265.) Among the causes of action was an allegation that the snowmaking equipment was defectively designed because of its location, padding, and uphill direction. (*Id.* at p. 271.) This court initially emphasized that strict liability contemplated use of the product and observed that the problem for plaintiff was "that she neither used the hydrant and nozzle, nor was she a bystander to its use." (*Ibid.*) This court explained, "Souza simply ran into the product, injuring herself. It is undisputed that the hydrant/nozzle was functioning properly as snowmaking equipment, and was not being used as a product at the time Souza crashed into it. As the trial court aptly put it, a plainly visible and generally avoidable snowmaking hydrant is not made defective simply because a skier runs into it." (*Ibid.*)

This brief discussion should not be construed as restricting strict liability to particular classes of uses. Although this court initially framed the issue in terms of the absence of any use of the equipment as a product, it specifically concluded the product was not defective in that it was *plainly visible and avoidable*. And this court subsequently addressed the plaintiff's argument "that the snowmaking equipment was defectively designed given the hydrant's location in the middle of the run and the nozzle's uphill direction." (*Souza v. Squaw Valley Ski Corp., supra*, 138 Cal.App.4th at p. 271.) If the fact that the snowmaking equipment was not operating at the time of the plaintiff's injury was dispositive, this court would not have extended its discussion to specifically address this issue. This court subsequently emphasized it was undisputed "that the hydrant was plainly visible, that there was sufficient room on either side of the snowmaking equipment for skiers to pass by, and that [the plaintiff] simply caught a ski edge, lost her balance, veered toward the equipment and collided with it." (*Ibid.*) Accordingly, this court agreed with the ski resort (and the trial court) that these circumstances did not describe a product defect but simply " 'an inherent risk of skiing.' " (*Ibid.*)

■ It would be a mistake to equate operation of a product by an ultimate consumer with "use" for purposes of strict liability. As we have explained, California provides broad protection to bystanders and does not limit strict liability to situations occurring after sale of the product or equivalent transaction. A manufacturer must reasonably anticipate uses of the product while it is on the market. A reasonably foreseeable use of gasoline is its storage while at a gas station.

Conclusion

Having complied with the procedural requirements for issuance of a peremptory writ in the first instance, we are authorized to issue the writ. (See *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].)

Let a peremptory writ of mandate issue directing respondent superior court to vacate its order granting defendant Exxon Mobil Corporation's motion for judgment on the pleadings, and enter a new and different order denying that motion. Upon finality of this decision, the stay previously issued is dissolved. Petitioner shall recover its costs of this proceeding.

Sims, J., and Butz, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied February 14, 2007, S148857. Kennard, J., Baxter, J., and Chin, J., did not participate therein.